I«CARTER, C.J.
The defendant, Tom Jones, was charged by grand jury indictment # 1-74-8052 with murder,[2] a violation of LSA-R.S. 14:30, and by grand jury indictment # 1-74-8053 with armed robbery, a violation of LSA-R.S. 14:64. He initially pled not guilty to both charges. He moved to quash indictment # 1-74-8052, but the motion was initially denied. The defendant withdrew his former plea on the armed robbery charge and pled guilty to that charge. He was sentenced to ninety-nine years at hard labor without benefit of parole, probation, or suspension of sentence. He moved for reconsideration of the motion to quash, and the motion was granted. He moved for reconsideration of sentence, but the motion was denied. He now appeals, designating one assignment of error.
FACTS
Due to the defendant’s guilty plea, no trial testimony was presented concerning the facts of the armed robbery offense. At the Boykin hearing, however, the State set forth a factual basis for the charge, in pertinent part, as follows:
On May 25, 1973, the defendant, Joe Siegel, Lloyd Powers, Bela Andrasi, Connie Dotson, Dale Bourland, and Eugene Redwine, while in an apartment at the Rembrandt Apartments, planned to go to the inhabited dwelling of H. Alva Brum-field and execute one of two plans. In the event Brumfield was not present, “plan A” was for the defendant, Bourland, and Red-wine to go into Brumfield’s home and look for money. It was believed that Brumfield had a safe in his home. In the event Brumfield was present when the defendant, Bourland, and Redwine arrived at the home, “plan B” was for Bourland to represent himself as a plain-clothes detective and for the defendant and Redwine to “rush” Brumfield into his home and rob him of his valuables at gunpoint therein. The defendant, Bourland, and Redwine armed themselves with guns, and the defendant and Bourland |3disguised themselves with wigs. Bourland dressed in dress slacks, sport coat, tie, and carried a police badge.
Brumfield returned to his home between 8:30 p.m. and 9:00 p.m., on May 25, 1973. The defendant was waiting on the roof of the home, wearing a wig, carrying a walk-ie-talkie, and armed with a shotgun. He had exited the vehicle Andrasi and Dotson sat in, retrieved a shotgun from the trunk, and walked up Brumfield’s drive with Red-wine and Bourland. Redwine and Bour-land had broken into Brumfield’s home and were waiting for him inside. Andrasi and Dotson sat in a car on the street, also with a walkie-talkie, serving as lookouts. They used their walkie-talkie to signal the defendant after seeing Brumfield’s white Mercedes coming down the street. The defendant followed Brumfield into the home after Brumfield exited his vehicle and unlocked his kitchen door. Andrasi and Dotson sat in their car approximately one and one-half hours after signaling the defendant and saw no one leave Brum-field’s home. They eventually left after Joe Siegel drove up and instructed them to return to the apartment.
*612 Brumfield’s key was still in the lock when his body was discovered the next day. His arms and legs had been tied behind his body with strips of sheets. He had been beaten with a blunt instrument, placed face down on the floor, and shot in the back of the head. The bullet was recovered from between Brumfield’s cheek and the floor. It was subsequently matched to a gun recovered from a field next to the Rembrandt Apartments. Brumfield’s gold coin money clip, which he carried with a large sum of money, was taken from him during the offense. Subsequently, the money clip was recovered from a man who received it from Terry Ashton Robertson after she received it from Bourland at a bar later during the evening of the offense. The money clip had contained $420. The money was distributed between the defendant, Siegel, Powers, Andrasi, Dotson, Bourland, and Redwine. A piece of paper was recovered from the apartment where the planning took place showing $420 being divided equally by seven.
The money clip was the only thing taken from Brumfield’s home during the offense. The house was ransacked, however, and paintings on the walls were found askew. Brumfield did not in fact have a safe in his home.
RThe State set forth that it would prove the defendant: knowingly participated in the offense; helped plan the offense; did not retreat; served as a lookout during the offense; did not leave until the murder was committed; returned to the Rembrandt Apartments following the offense; fled the State; and was not apprehended until January 1997.
When the defendant was asked if he agreed with the State’s factual basis, he stated he agreed with some of the facts set forth, but disagreed with others. Defense counsel stated the defendant agreed to the facts concerning his participation in an armed robbery, but disagreed with the allegation that he had followed Brumfield into the home.
EXCESSIVE SENTENCE
In his sole assignment of error, the defendant contends the trial court erred in imposing a maximum sentence upon him. He argues he was merely a lookout for a crime that went bad, he withdrew from the incident prior to the killing of the victim, the 'offense was not the most serious offense, his four felony convictions occurred over a period of forty years, he led a crime free life following the offense, and the trial court faded to adequately consider the sentencing guidelines of LSA-C.Cr.P. art. 894.1 in sentencing him.

LOUISIANA CODE OF CRIMINAL PROCEDURE ARTICLE 894.1

The Louisiana Code of Criminal Procedure sets forth items that must be considered by the trial court before imposing sentence. LSA-C.Cr.P. art. 894.1. The trial court need not recite the entire checklist of Article 894.1, but the record must reflect that it adequately considered the criteria. State v. Herrin, 562 So.2d 1, 11 (La.App. 1st Cir.), writ denied, 565 So.2d 942 (La.1990). In light of the criteria expressed by Article 894.1, a review for individual excessiveness should consider the circumstances of the crime and the trial court’s stated reasons and factual basis for its sentencing decision. State v. Watkins, 532 So.2d 1182, 1186 (La.App. 1st Cir.1988).

CONSTITUTIONAL EXCESSIVENESS

Article I, Section 20, of the Louisiana Constitution of 1974 prohibits the imposition of excessive punishment. Although a sentence may be within statutory limits, it may violate a defendant’s constitutional right against excessive punish *613 ment and is subject to appellate review. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). Generally, a | .^sentence is considered excessive if it is grossly disproportionate to the severity of the crime or is nothing more than the needless imposition of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm to society, it is so disproportionate as to shock one’s sense of justice. State v. Reed, 409 So.2d 266, 267 (La.1982). A trial judge is given wide discretion in the imposition of sentences within statutory limits, and the sentence imposed should not be set aside as excessive in the absence of manifest abuse of discretion. State v. Lanclos, 419 So.2d 475, 478 (La.1982).
Whoever commits the crime of armed robbery shall be imprisoned at hard labor for not less than five years and for not more than ninety-nine years, without benefit of parole, probation or suspension of sentence. LSA-R.S. 14:64B. (prior to amendment by 1999 La. Acts No. 932, § 1). The defendant was sentenced to ninety-nine years at hard labor without benefit of parole, probation, or suspension of sentence.
In sentencing the defendant, the court noted: the victim died during an armed robbery to which the defendant was a principal and in which he had a part; the defendant was a fourth felony offender; the defendant engaged in the instant offense less than four days after being released from the department of corrections; the fact that twenty-seven years had passed since the offense and during that time the defendant had lived without violating the criminal codes of Texas, Oklahoma, Utah, or Louisiana following the offense was not a major factor because the delay was due to the defendant leaving Louisiana and changing his identity; the defendant’s conduct in the years following the offense did not supersede his conduct on the date of the offense; the justice delayed in the case could not be further denied; a lesser sentence than the sentence the court would impose would deprecate the seriousness of the offense; while there might be no risk at the defendant’s stage in life that he would commit another offense, he was in need of correctional treatment which could best be provided by a penal institution; the fact that the defendant was sixty-two years old could not supersede the court’s decision; the court had listened attentively to the arguments of defense counsel, the defendant’s loved ones, and the victim’s family who had lived with the defendant’s offense for twenty-seven years; the victim had done nothing but work hard to make a living for his family; he came home one | fiday and was forced to face the consequences of the actions of the defendant and his cohorts; the court did not doubt that the defendant did not intend to be part of a murder or intend for the victim to die, but consequences flowed from the defendant’s presence at the crime scene, and the defendant’s actions helped in the victim’s demise, which occurred in a treacherous manner.
A thorough review of the record reveals no manifest abuse of discretion in the trial court’s imposition of the sentence herein, which was not violative of LSA-C.Cr.P. art. 894.1. See LSA-C.Cr.P. art. 894.1A(2), LSA-C.Cr.P. art. 894.1A(3), LSA-C.Cr.P. art. 894.1B(9), LSA-C.Cr.P. art. 894.1B(12), LSA-C.Cr.P. art. 894.1B(21). Further, the sentence imposed was not grossly disproportionate to the severity of the offense, and thus, was not unconstitutionally excessive.
Additionally a maximum sentence was warranted in this case. Maximum sentences may be imposed for the *614 most serious offenses and the worst offenders, or when the offender poses an unusual risk to the public safety due to his past conduct of repeated criminality. State v. Miller, 96-2040, p.4 (La.App. 1st Cir.11/7/97), 703 So.2d 698, 701, writ denied, 98-0039 (La.5/15/98), 719 So.2d 459.
The instant offense was a most serious armed robbery because it directly resulted in the victim’s brutal death, and the defendant was a principal to that most serious offense. The defendant’s arguments are unconvincing. He claims his participation in the crime was limited to the role of lookout. However, under “plan B,” the plan which the physical evidence suggests was in fact executed, the defendant’s role was to assist Redwine in forcing Brumfield into his home for the purpose of robbing him at gunpoint. Further, the defendant’s contention that he did not follow Brumfield into the home was inconsistent with the fact that the victim did not even have a chance to remove his key from his home’s lock before being forced into the home. The defendant’s contention that the instant armed robbery was not the most serious offense is untenable. While being robbed at gunpoint, the victim herein was tied up, beaten, and fatally shot in his own home. The defendant argues a more serious armed robbery would be one in which the perpetrator planned to kill the victim during the offense, decided to kill the victim while committing the offense, or was subjected to liability for a felony murder. A person may be convicted of an offense even if 17he has not personally fired the fatal shot. The law of principals states that all persons involved in the commission of a crime, whether present or absent, are equally culpable. See LSA-R.S. 14:24. State v. Hampton, 98-0331, p.13 (La.4/23/99), 750 So.2d 867, 880, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999). The defendant was a principal to the instant offense and, as such, he is not without culpability for the victim’s death merely because he may not have personally shot the victim. In any event, the defendant was legally sentenced for armed robbery; he was not sentenced for murder.[3] In sentencing the defendant, the trial court certainly was not required to ignore the fact that the victim was killed during the offense. The defendant’s remaining arguments, i.e., that his four felony convictions were over a period of forty years and that he led a crime free life following the offense also fail to establish the excessiveness of the sentence imposed. The defendant was convicted of felony theft in 1960, armed robbery in 1963, simple burglary in 1969, and the instant offense in 2000. Had the defendant not fled Louisiana and remained at large under a false identity for over twenty-three years following the instant offense, the conviction date for the instant offense would have been much closer to the offense’s 1973 commission. Further, while the record does not contradict the defendant’s contention that he led a law-abiding life over the twenty-three years between the instant offense and his apprehension, it was in the defendant’s self-interest not to draw attention to himself by engaging in criminal activity while he was in hiding. It must also be noted that the defendant’s flight from justice denied the victim’s family closure for approximately a quarter of a century. This assignment of error is without merit.
CONCLUSION
For the reasons set forth in this opinion, the defendant’s conviction and sentence are affirmed.
*615 CONVICTION AND SENTENCE AFFIRMED.

. The modem differentiation of first degree murder and second degree murder was made after the commission of the criminal conduct involved herein. See 1973 La. Acts No. 109, § 1 (rewriting LSA-R.S. 14:30 and designating it first degree murder); 1973 La. Acts No. Ill, § 1 (adding LSA-R.S. 14:30.1).

. See footnote # 2, supra.