KUHN, J.
| ¡¿Defendant, Devin Deon Collins, was ■charged by East Baton Rouge Parish grand jury indictment with one count of conspiracy to commit attempted second degree murder, in violation of La. R.S. 14:26, 27 and 30.1 (count 1), and two counts of attempted second degree murder, in violation of La. R.S. 14:27 and 30.1 (counts 2 and 3). He pled not guilty and waived his right to a jury trial. During his bench trial, defendant moved for judgment of acquittal at the conclusion of the State’s evidence. The trial court heard argument and took the motion under advisement. Thereafter, the trial court granted the motion for acquittal on count 1 only. The motion was denied as to counts 2 and 3. At the conclusion of the trial, defendant was convicted on counts 2 and 3 of the responsive offense of aggravated battery. See La. R.S. 14:34. Defendant filed motions for post-verdict judgment of acquittal and a new trial. The trial court denied the motions. Defendant was sentenced to serve six years at hard labor for each count. The trial court ordered that the sentences run consecutively. Defendant now appeals, challenging the sufficiency of the State’s evidence in support of his convictions. We affirm defendant’s convictions and sentences.
FACTS
On the evening of July 4, 2007, many people gathered along the levee near downtown Baton Rouge to watch the annual Fourth of July fireworks display. At the conclusion of the display, a series of gunshots were fired into the crowd of people in the area near the USS Kidd museum. Unfortunately, Kayla Smith and Robert Blunschi, innocent bystanders, found themselves in the line of fire. They Rboth sustained gunshot wounds and suffered *246 serious bodily injuries. Kayla was shot through the torso. Robert was shot in the head.
Shortly after the shooting, defendant was seen running in the area. His clothing matched a general description the police received regarding one of the shooters. When an officer attempted to stop him, defendant discarded a .25 caliber handgun. Although the victims’ injuries were not caused by a .25 caliber bullet, defendant subsequently was indicted, as a principal, for his involvement in the shooting.
The following evidence was presented at trial regarding the circumstances surrounding the shooting.
Kayla testified she went to the levee on the night in question to watch the fireworks with Robert and some other friends. They arrived early and were positioned at the ground level near the bank of the river. After the fireworks ended, Kayla and her friends walked up the steps to the top of the levee and proceeded south in the direction of their vehicle. Moments later, Kayla heard approximately three or four gunshots. Kayla stated she “lost connection to [her] legs” and collapsed onto the ground. She had been hit in her right side with a nine-millimeter bullet. Kayla did not see who was responsible for the shooting.
Due to the severity of his injuries, Robert was unable to testify at the trial. His mother, Glenda Blunschi, testified that Robert underwent a double craniotomy as a result of the injuries sustained in the shooting. He requires constant living assistance and is unable to communicate verbally.
Robert’s cousin, Michael Verbois, testified that he accompanied Kayla and Robert to the levee on the night in question. According to Michael, approximately |4ten minutes after the fireworks display ended, the group was walking along the sidewalk at the top of the levee when he heard approximately ten gunshots. Although he was unsure of the direction from which the bullets came, Michael explained that the group was walking south in the direction toward the Mississippi River Bridge when the gunfire started. They were headed towards the Pastime Restaurant, where Robert’s vehicle was parked. Kayla and Robert were hit by bullets. Michael testified that he did not see anyone with a gun prior to the shooting. However, immediately after he noticed Kayla and Robert on the ground, he observed a black male running down the levee toward the street. The individual was wearing a white t-shirt and black or dark colored shorts. On cross-examination, Michael admitted that there were several individuals in the area clad in white t-shirts and dark colored shorts.
Jeremy Signater testified that he and his girlfriend were walking along the levee when the shooting began. Immediately prior to the shots being fired, Signater observed a crowd gathered in the area and heard someone say “they got a gun over there[.]” He then heard a female say, “don’t do that, my little brother’s over there.” Signater grew concerned. When the first shot was fired, Signater tackled his girlfriend to the ground and they rolled down the grassy side of the levee. Signa-ter looked up and observed an African American male wearing a tan shirt running down the grass toward the street. He was shooting at three other African-American males as they ran away. The shooter ran toward a nearby parking lot, bent down near the parked vehicles and then ran back up the levee and left in the opposite direction. Signater did not see anyone else shooting. According to Signa-ter, the shooting he witnessed started at the top of the levee and | ^proceeded down away from the river. He did not observe *247 anyone running away from the river towards the top of the levee. He explained he was already on the ground on the grassy side of the levee when he initially observed the shooter. Signater further explained that he could only identify the shooter and the three individuals being chased as African-Americans. He could not provide further description of the men because he lost his glasses when he fell.
Catherine Doiron, an employee with the Louisiana Department of Public Safety and Corrections, Division of Probation and Parole, testified that she attended the fireworks display with her family on the night of the shooting. She was seated on the steps in an area north of the USS Kidd. Shortly after the fireworks display started, Doiron observed a verbal altercation between two groups of African-American youths. The verbal exchange prompted Doiron to call 911 and report the matter. The situation was momentarily diffused when one of the groups attempted to walk away. However, the other group aggressively followed and continued to taunt the retreating group. Upon observing a police officer in the area, Doiron’s husband advised the officer that the feuding groups had moved further down the river towards the USS Kidd.
Near the end of the fireworks display, Doiron observed two African-American males walking along the top of the levee. One of the men stated, “They want guns. I’ve got my nine right here.” Because the lighting was limited, Doiron was unable to facially identify the individual who made the statement. However, she made note of his general appearance. She testified that the individual was approximately five feet, seven inches tall, with a medium to low haircut and a medium complexion. The individual was wearing a black shirt and black pants. | fSDoiron further testified that she and her family left the area immediately after the fireworks display ended. They were no longer at the levee when the shooting occurred.
Lieutenant Noel Salamoni of the Baton Rouge Police Department testified that on the night of the shooting he was on duty at the fireworks event on the levee. Shortly after the fireworks display concluded, Lt. Salamoni heard a large number of gunshots. The shots appeared to have come from behind the USS Kidd museum. As he ran in that direction, Lt. Salamoni overheard a broadcast indicating that a subject wearing white pants had been firing shots and was running away from the area. Shortly thereafter, Lt. Salamoni observed two African-American males, subsequently identified as defendant and Michael Judson, running from behind the museum on the levee side. Defendant was wearing white shorts. With his weapon drawn, Lt. Salamoni ordered the men to stop and get on the ground. Judson complied, but defendant continued to move toward Lt. Sa-lamoni with his hand in his pocket. Defendant eventually removed a .25 caliber automatic handgun from his pocket and tossed it backwards toward Judson. Lt. Salamoni forced defendant to the ground and later handcuffed him. The handgun defendant discarded was collected as evidence. A nine-millimeter Ruger semiautomatic handgun subsequently was located in an area nearby.
Medical reports introduced into evidence established the trajectory of the bullets that injured the victims. Robert sustained a gunshot wound to the head with the trajectory of blood and bone seen extending from the right side of the 17brain to the left.[1] Kayla was shot through the torso, *248 from the right flank to the left flank. The bullet hit several major organs, including her spinal cord.
Corporal Kevin Adcock, of the Baton Rouge Police Department Crime Scene Division, testified he -was dispatched to the levee to assist in collecting evidence from the shooting. Upon arrival, Cpl. Adcock was directed to the weapon defendant discarded. He collected the Browning .25 caliber automatic handgun (the Browning). Four live rounds of ammunition were found in the magazine and one live round in the chamber of the weapon. DNA samples were collected from the grip, the trigger, and the slide of the weapon. DNA samples were also collected from defendant. Results of gunshot residue testing on defendant were presumptive positive. However, Cpl. Adcock admitted that use of fireworks could produce a positive result equivalent to that of firing a gun. Cpl. Adcock also recovered a Ruger semi-automatic nine-millimeter handgun (the Ruger) from the northwest corner of River Road and France Street.[2] Cpl. Adcock’s attention was also directed to a shattered window in the second floor of Shucks on the Levee (“Shucks”).[3] A spent projectile was found on the floor inside of Shucks. Eleven nine-millimeter shell casings were found near the fifth bench from the casino.[4] The victims were found on top of the levee next to the sixth bench.
|sThe following day, Detective Ross Williams, of the Baton Rouge Police Department, returned to the levee to further investigate. At this time, a .25 caliber shell casing was found down near the fifth step, by the seventh bench marker, on the riverside of the levee. Det. Williams also found a live nine-millimeter bullet and two nine-millimeter casings on the top of the levee. With the evidence collected from the levee, Det. Williams sketched diagrams depicting the positions of the casings found and the path of the bullets fired on the night in question. The diagrams were introduced into evidence at the trial.[5]
Charles Watson, an expert in firearms analysis, testified that the .25 caliber casing recovered from the step on the riverside of the levee was fired from the same weapon discarded by defendant. Watson further testified that the lead projectile recovered from the floor at Shucks was consistent with one from a .25 caliber automatic weapon. Because the jacket had been separated from the bullet core, Watson was unable to definitively connect the projectile with defendant’s .25 caliber weapon. A spent copper jacketing was also found in a sign on the second floor of Shucks. Watson testified that this projectile matched the jacketing of the nine-millimeter Ruger. Watson also testified that the injuries sustained by the victims *249 were more consistent with having been caused by a nine-millimeter 19handgun. The injuries were not caused by a .25 caliber weapon.
DNA analysis expert Joanie Wilson testified that the profile of the samples taken from the Browning matched the DNA profile of defendant. Wilson explained that the probability of the sample being that of someone other than defendant was 1 in 26.3 trillion. DNA testing of the sample taken from the Ruger revealed a mixture of DNA from at least three individuals. The major contributor of the DNA from the Ruger was an individual named Marvin Brown.[6]
SUFFICIENCY OF THE EVIDENCE
In a single assignment of error, defendant maintains he is entitled to reversal of his convictions based on the insufficiency of the State’s evidence.
A conviction based on insufficient evidence cannot stand as it violates due process. See U.S. Const, amend. XIV; La. Const, art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La.C.Cr.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988).
When analyzing circumstantial evidence, La. R.S. 15:438 provides, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” This statutory test is not a purely separate one from the Jackson constitutional sufficiency | ^standard. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Shanks, 97-1885, pp. 3-4 (La.App. 1st Cir.6/29/98), 715 So.2d 157, 159.
In support of his judgments of conviction in this case, the trial judge stated:
As an underpinning to this decision, I found that the defendant was a [principal] in crimes that were committed on July 4, 2007. A shell casing from the gun found on his—found on the steps was in close proximity of the other shell casing fired from a Ruger nine-millimeter. His DNA was found on a weapon and the manner in which he tried to avoid detection of the gun, coupled with being detained moments after the shooting are circumstantial evidence that he had fired the gun only moments before. Although I have found Mr. Collins to be a [principal], I find his involvement was not as substantial as others on the levee that night, as his bullet caused no damage to any person on the levee on July 4, 2007. As a result of this limited culpability, I find him guilty of the responsive charges of aggravated battery, two counts.
On appeal, defendant contends the aggravated battery convictions must fall because the State, in failing to present evidence that he had any physical contact with either victim or that he caused any of the victims’ injuries, did not prove all of the essential elements of the offense of *250 aggravated battery. Citing State v. Dauzat, 392 So.2d 393 (La.1980), the defendant claims that the State was required to prove every element of the crime, despite the fact that the conviction was by way of a responsive verdict.
Our review of the record and the relevant law reflects that the defendant’s reliance on Dauzat is misplaced. Although the Dauzat court reversed a conviction for aggravated battery a legislatively authorized responsive verdict to attempted murder — because the evidence was insufficient to support aggravated battery, although it was sufficient to support the charged offense, 392 So.2d at 396, the |nLouisiana Supreme Court later adopted a different approach. In State ex rel. Elaire v. Blackburn, 424 So.2d 246, 251-52 (La.1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983), after considering the newly amended Article 814, the court held:
[EJven if the offense is legislatively designated as responsive by Article 814, the defendant may timely object to an instruction on a responsive verdict on the basis that the evidence does not support that responsive verdict. If the court overrules the objection and the jury returns a verdict of guilty of the responsive offense, the reviewing court must examine the record to determine if the responsive verdict is supported by the evidence and may reverse the conviction if the evidence does not support the verdict. However, if the defendant does not enter an objection (at a time when the trial judge can correct the error), then the reviewing court may affirm the conviction if the evidence would have supported a conviction of the greater offense, whether or not the evidence supports the conviction of the. legislatively responsive offense returned by the jury.
It would be unfair to permit the defendant to have the advantage of the possibility that a lesser “compromise” verdict will be returned (as opposed to being convicted of the offense charged) and then to raise the complaint for the first time on appeal, that the evidence did not support the responsive verdict to which he failed to object. Therefore, at least when the defendant fails to interpose a timely objection to a legislatively responsive verdict, this court will not reverse the conviction if the jury returns such a verdict, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged. (Footnotes omitted).
The record before us reflects that defendant never objected to the inclusion of aggravated battery as a responsive offense. In his reply brief, defendant asserts he did, in fact, make an objection to the responsive verdict of aggravated battery prior to the trial court’s judgments of conviction. He points to a post-trial “Memorandum in Support of a Judgment of Acquittal” wherein he noted that the State was required to prove all of the elements of the offense beyond a reasonable doubt and argued that he should be acquitted because his conduct did not cause | ^physical damage to anyone. Defendant asserts that this “factual argument” was tantamount to an objection to the inclusion of aggravated battery as a responsive offense. We disagree. We find that defendant’s memorandum, which discussed the insufficiency of the evidence to support attempted second degree murder convictions, did not constitute an objection to the inclusion of aggravated battery as a responsive offense. As the State correctly notes, there was no objection to the legislatively-approved responsive offenses by defendant.
*251 Aggravated battery is a legislatively approved responsive verdict to a charge of attempted second degree murder. See La.C.Cr.P. art. 814(A)(4). Accordingly, defendant is entitled to a reversal of his convictions only if the evidence is insufficient to support a conviction of the charged offenses, attempted second degree murder. The factfinder has the right to “compromise” between the charged offense and a verdict of not guilty. See State v. Charles, 2000-1611, p. 4 (La.App. 3d Cir.5/9/01), 787 So.2d 516, 519, writ denied, 2001-1554 (La.4/19/02), 813 So.2d 420. A “compromise” verdict is allowed for whatever reason the factfinder deems to be fair, so long as the evidence is sufficient to sustain a conviction for the charged offense. See State ex rel Elaire v. Blackburn, 424 So.2d at 251. Thus, it is appropriate for us to review the sufficiency of the evidence to support convictions for attempted second degree murder.
Prior to a 2009 amendment, La. R.S. 14:30.1(A) defined second degree murder, in pertinent part, as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. Under La. R.S. 14:27(A), a person is guilty of an attempt to commit an offense when he has a specific intent to 11scommit a crime and “does or omits an act for the purpose of and tending directly toward the accomplishing of his object.”
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). To be guilty of attempted second degree murder, a defendant must have the specific intent to kill and not merely the specific intent to inflict great bodily harm. State v. Maten, 2004-1718, p. 5 (La.App. 1st Cir.3/24/05), 899 So.2d 711, 716, writ denied. 2005-1570 (La.1/27/06), 922 So.2d 544. Specific intent to kill can be implied by the intentional use of a deadly weapon, such as a knife or a gun. See State v. Brunet, 95-0340, p. 8 (La.App. 1st Cir.4/30/96), 674 So.2d 344, 349, writ denied, 96-1406 (La.11/1/96), 681 So.2d 1258. Further, specific intent may be inferred from a defendant’s actions and the circumstances. State v. Broaden, 99-2124, p. 18 (La.2/21/01), 780 So.2d 349, 362, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001). The discharge of a firearm in the direction of a crowd of innocent bystanders has repeatedly been recognized in the jurisprudence as sufficient to prove specific intent to kill. State v. Mart, 419 So.2d 1216 (La.1982); State v. Allen, 94-1941 (La.App. 1st Cir.11/9/95), 664 So.2d 1264, writ denied, 95-2946 (La.3/15/96), 669 So.2d 433; State v. Powell, 94-1390 (La.App. 1st Cir.10/6/95), 671 So.2d 493, writ denied, 95-2710 (La.2/9/96), 667 So.2d 529; State v. Kennington, 515 So.2d 521 (La.App. 1st Cir.1987); State v. Thomas, 609 So.2d 1078 (LaApp. 2d Cir. 1992), writ denied, 617 So.2d 905 (La.1993); State in the Interest of L.H., 94-903 (La.App. 3d Cir.2/15/95), 650 So.2d 433.
|14In this case, the State offered sufficient proof from which the trial court could have reasonably concluded that defendant fired the .25 caliber handgun toward the crowd, at least once, during the levee shooting. The direct and circumstantial evidence established that defendant was present in the area with the .25 caliber handgun in his possession immediately after the shooting. Defendant tested positive for the presence of gunshot residue. A spent shell casing from the .25 caliber handgun was found in close proximity to the area where the shooting occurred. The evidence also established that the projectile that shattered the window at Shucks was in direct line with spent .25 caliber shell casing and the area where the *252 victims were found. Furthermore, as the trial judge noted, defendant’s actions of attempting to evade the police and to conceal the weapon after he was observed running away, immediately after the shooting occurred, also tend to discredit the claim that he did not fire the weapon on the night in question. This evidence, when considered in the light most favorable to the prosecution, supports a finding that defendant fired a single shot toward the crowd gathered on the levee and is sufficient to fulfill all of the essential elements of attempted second degree murder. But because defendant fired only one shot, to support both convictions, we must consider whether the evidence is sufficient to show that defendant knowingly and actively participated as a principal in the offenses committed by the unidentified shooter of the nine-millimeter handgun.
La. R.S. 14:24, which addresses principals, provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
11fiHowever, “[m]ere presence at the scene is not enough to ‘concern’ an individual in the crime.” State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427, 428.
The evidence introduced in this case clearly established that an unidentified individual, armed with a nine-millimeter handgun, fired indiscriminately into the crowd gathered at the levee. Numerous nine-millimeter spent casings were found on the riverside steps, on the top sidewalk, and down the grassy side of the levee. Expert testimony established that the injuries to both victims were caused by nine-millimeter bullets. Expert testimony further showed that the copper jacketing found at Shucks was consistent with the nine-millimeter Ruger handgun found in the area nearby. Clearly, when this evidence is viewed in the light most favorable to the prosecution, the nine-millimeter shooter’s actions exhibited intent to kill. Although defendant did not fire the shots that seriously injured the victims, the evidence established that defendant participated in the shooting at the levee. Located in close proximity to the .25 caliber casing were several spent nine-millimeter casings. The bullet fragments recovered from Shucks were determined to be consistent with the .25 caliber Browning and the nine-millimeter Ruger. The State’s evidence recreated the path of both the nine-millimeter and .25 caliber bullets from the lower riverside of the levee, up through the crowd at the ground level, and then through the air and into the window at Shucks. Considering this ballistics evidence, and the trajectory of the bullets that injured the victims, it was established that defendant was a principal with the unidentified shooter of the nine-millimeter weapon.
Defendant also challenges the finding of specific intent. He asserts that the doctrine of transferred intent is inapplicable in this case because the State failed to Improve the identity of the offender who fired the gun that actually injured the victims or the identity of the “intended victim.”
As noted above, firing a weapon directly into a crowd of bystanders satisfies the specific intent requirement, even if no intended victim is identified. See State v. Brooks, 42,226 (La.App.2d Cir.8/15/07), 962 So.2d 1220, 1224. All persons involved in the commission of a crime, whether present or absent, are equally culpable. State v. Hampton, 98-0331, p. 13 (La.4/23/99), 750 So.2d 867, 880, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 *253 L.Ed.2d 390 (1999); State v. Jones, 2000-2009, p. 7 (La.App. 1st Cir.5/11/01), 808 So.2d 609, 614, writ denied, 2001-1698 (La.5/3/02), 815 So.2d 93. A person who aids and abets another in a crime is liable just as the person who directly commits it, although he may be convicted of a higher or lower degree of the crime, depending on the mental element proved at trial. See State v. Watson, 397 So.2d 1337, 1342 n. 10 (La.1981), cert. denied, 454 U.S. 903, 102 S.Ct. 410, 70 L.Ed.2d 222 (1981).
Reviewing the evidence in the light most favorable to the State, we are convinced that the evidence presented was sufficient to support defendant’s conviction as a principal to the attempted second degree murder committed by the unidentified shooter. The fact that the identity of the co-perpetrator was not proven is of no moment. The trial testimony provides sufficient evidence from which a reasonable factfinder could have concluded beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that defendant fired the .25 caliber gun into the crowd and that he also was actively involved in the shootout.
This assignment of error lacks merit.
|17DECREE
For these reasons, we affirm the convictions and sentences of defendant, Devin Deon Collins.
CONVICTIONS AND SENTENCES AFFIRMED.

. Although the evidence regarding the severity of the victims' injuries was limited at the actual trial, the testimony presented at the sentencing hearing established that Kayla, a *248 sixteen-year-old former dancer,, was left paralyzed. Robert suffered severe brain damage with paralysis to his left side. The former power lifter is no longer able to walk, speak, or feed himself.

. This is the same area where Jeremy Signa-ter observed an individual bend down near some parked vehicles and then get up and ran away.

. Shucks is a restaurant located on the second level of the Argosy Casino property. The second floor of Shucks is actually three stories high.

. To inform the jury, diagrams of the area were drawn. Witnesses were asked to identify locations on the diagrams, which utilized as landmarks the benches situated on top of the levee, from the canopy of the walkway of the Belle of Baton Rouge Casino down the sidewalk heading in a northerly direction, to the walkway of the USS Kidd.

. As part of the State's evidence, the trial judge went to the levee and personally observed the crime scene.

. Marvin Brown was indicted with defendant. However, counts 2 and 3 were later dismissed as to Brown and count 1 was amended to conspiracy to commit aggravated battery. Defendant was tried alone. There is no further information regarding the charges against Brown in the record.