WELCH, J.
The defendant, Desmond Herbert Cousin, was charged by bill of information with bank fraud, a violation of La. R.S. 14:71.1. He pled not guilty and, following a jury trial, was found guilty as charged. The defendant filed a motion for postverdict judgment of acquittal, which was denied. The defendant was sentenced to six years imprisonment at hard labor. The State filed a habitual offender bill of information. The defendant admitted to the allegations in the bill, and the trial court adjudicated him a third-felony habitual offender.[1] The trial court vacated the six-year sentence and resentenced the defendant to eight years imprisonment at hard labor without benefit of probation or suspension of sentence. The defendant now appeals, designating three assignments of *956 error. For the following reasons, we affirm the conviction, we vacate the habitual offender adjudication and enhanced sentence, we reinstate the original six-year sentence and we remand to the trial court.
FACTS
On September 22, 2016, the defendant went to the Capital One Bank in Mandeville on La. Highway 22. He handed a check to teller Geraldine Johnson and asked her to cash it. The check was ostensibly a company check from Select Stone, LLC, a wholesale distributor of home improvement items including stone slabs, marble, and granite. The check was made payable to the defendant for the amount of $1,929.00. The defendant was not a customer with the bank. Geraldine took the defendant's identification and noticed that he had a Berwick, Louisiana home address. She also noticed there was something a "little bit off" with the check, such as the different sized fonts between the defendant's typed name and the amount of the check in typed words.
Geraldine took the defendant's I.D. and the check, told the defendant she needed to verify the check, and went to her supervisor's office. At that point, the defendant asked for his identification and the check back. Geraldine assured the defendant that she would be back shortly. Geraldine pulled the account number of Select Stone, LLC and called Melissa Capello, the company's office manager. Geraldine gave Melissa all of the information, and Melissa confirmed that the check the defendant gave her was not a Select Stone, LLC check, the defendant was not one of their employees, and she had never heard of him. Melissa told Geraldine it was a fraudulent check and to call the police, which she did. While Geraldine was on the phone with the 911 dispatch, the defendant again attempted to get his I.D. and check back. When Geraldine did not return these items, the defendant left without them, and was apprehended by the police just outside of the bank.
The defendant did not testify at trial.
ASSIGNMENTS OF ERROR NOS. 1 and 2
In his first and second assignments of error, the defendant argues the evidence was insufficient to support the conviction for bank fraud. Specifically, the defendant contends the State failed to prove he had the intent to commit bank fraud. As such, the trial court erred in denying the motion for postverdict judgment of acquittal.
A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV ; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See La. C.Cr.P. art. 821(B) ; State v. Ordodi , 2006-0207 (La. 11/29/06), 946 So.2d 654, 660 ; State v. Mussall , 523 So.2d 1305, 1308-1309 (La. 1988). The Jackson standard of review, incorporated in La. C.Cr.P. art. 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. See State v. Patorno , 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144.
Under La. R.S. 14:71.1, bank fraud is defined in pertinent part as follows:
*957 A. Whoever knowingly executes, or attempts to execute, a scheme or artifice to do any of the following shall be imprisoned, with or without hard labor, for not more than ten years, or may be fined not more than one hundred thousand dollars, or both:
(1) To defraud a financial institution.
(2) To obtain any of the monies, funds, credits, assets, securities, or other property owned by or under the custody or control of a financial institution by means of false or fraudulent pretenses, practices, transactions, representations, or promises.
Bank fraud is a specific intent crime. See State v. Cunningham , 46,664 (La. App. 2nd Cir. 11/2/11), 77 So.3d 477, 481. Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant. State v. Cousan , 94-2503 (La. 11/25/96), 684 So.2d 382, 390. Specific intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of defendant. State v. Graham , 420 So.2d 1126, 1127 (La. 1982). The existence of specific intent is an ultimate legal conclusion to be resolved by the trier of fact. State v. McCue , 484 So.2d 889, 892 (La. App. 1st Cir. 1986).
In State v. Forbs, 2007-1007 (La. App. 4th Cir. 4/23/08), 983 So.2d 954, 957, the court noted that La. R.S. 14:71.1 is similar to the federal crime of bank fraud, 18 U.S.C. § 1344, and that the intent necessary to sustain a conviction under § 1344 is the intent to deceive a bank in order to obtain money or other property. Further, specific intent is established "by the existence of a scheme which was 'reasonably calculated to deceive persons of ordinary prudence and comprehension,' and this intention is shown by examining the scheme itself." Id. ,citing United States v. Green , 745 F.2d 1205, 1207 (9th Cir. 1984), cert. denied, 474 U.S. 925, 106 S.Ct. 259, 88 L.Ed.2d 266 (1985) ; see also Cunningham , 77 So.3d at 481.
In his brief, the defendant notes the fact that the check was fraudulent was not challenged. Instead, he argues the State failed to prove he intentionally defrauded the bank or that he knew the check was stolen. The defendant suggests the State presented no evidence of "a scheme or artifice to defraud" because he presented only a single check to the bank. The defendant suggests that he mistakenly believed that the check was legitimately issued to him. The defendant further suggests that his "strange" or "odd" behavior after Geraldine took his check and I.D. to further investigate the matter did not prove he had the intent to defraud the bank. Finally, the defendant suggests that the defense offered a hypothesis of innocence that raised reasonable doubt; that is, according to the defendant, the defendant had done some work for a man named Travis Davis, and Travis was the person who had paid the defendant with that fraudulent check.
The check the defendant tried to cash was made out to him for the amount of $1,929.00. The drawer of the check is Select Stone, LLC. On the "PAY TO THE ORDER OF" line, the defendant's name is typed in block letters, that is, "DESMOND H COUSIN." On the right side of the check, there is a dollar sign next to a rectangular box. Inside that box is the numerical amount to be paid. The check is signed by "Melissa K Capella." The color of the fraudulent check is a light purple.
Geraldine Johnson, the teller at Capital One Bank who handled the defendant's check, testified about some of the issues *958 with the check that caused her concern. She noted that the font of the defendant's blocked name was different from the font used for the written numerical amount ("ONE-THOUSAND NINE-HUNDRED-TWENTY-NINE"). She noticed that the defendant's name, as well as his name and address at the bottom of the check (also in all caps), was in bold font as compared to the written numerical amount. Geraldine also discovered the defendant did not have an account with Capital One Bank. Because of this, she needed two forms of identification. Geraldine became further alarmed when she realized that Select Stone, LLC was a Baton Rouge business, yet the defendant's identification indicated that he was from Berwick, Louisiana. Geraldine explained at trial that based on her training, it was a "red flag" that the defendant's personal address, the location of the payor bank (Mandeville), and the place of business writing the check, were in three different locations.
Melissa Capello, the office manager and bookkeeper for Select Stone, LLC, testified that her company has only two locations, in Baton Rouge and Broussard. Her company had a total of fifteen employees and she knew them all. Other than an out-of-state employee who lived in New Jersey, Melissa was the only person authorized to sign company checks. She also noted that they do not handwrite checks; rather all the company checks are computer-generated and printed out. When Geraldine contacted Melissa to ask her about the check the defendant was attempting to cash, Melissa attempted to look up this check by check number, the payee, and the amount. Melissa had never heard of the defendant, as an employee or otherwise. Her company had never issued a check to the defendant; nor did she have a record of that check number or amount. Melissa also noted at trial the names of the payees on their business checks are not in all caps. She also noted that on the fraudulent check, the routing number was below the bottom line of the check, whereas the routing number on an authentic business check is above the bottom line of the check. Melissa pointed out that on her business checks, there is no box for the numerical amount after the dollar sign, as there was on the fraudulent check. Melissa also testified that her last name ends in an "O"; on the fraudulent check, however, her name is spelled "Capella." Finally, Melissa testified that she was the only person who ordered checks, and that she would not order purple checks.
When Geraldine became alarmed that the defendant's check might be fraudulent, she took the check and the defendant's I.D., told the defendant she would be right back, and started toward the office of her line supervisor. The defendant told her that he wanted his check and I.D. back. She kept the items, told the defendant it would be "okay," and went to her supervisor's office. She called Melissa Capello, who confirmed the check was fraudulent; Melissa then told Geraldine to call the police. Geraldine testified that, while she was in the office, she saw the defendant with a cell phone by his ear and "pacing back-and-forth." Geraldine called 911 and provided a description of the defendant to the dispatcher. The defendant came to the office Geraldine was in, knocked on the window, and told her he had to leave and that he wanted his check and I.D. back. Geraldine kept the check and I.D. while her boss tried to stall the defendant and keep him in the bank until the police arrived. Moments later, the defendant left the bank without his check and I.D. Geraldine testified that while she was still on the phone with 911, the dispatcher told her that the police had "nabbed" the defendant outside.
*959 Officer Stephen Tarzia, with the Mandeville Police Department, was one of the officers who assisted in apprehending the defendant. Officer Tarzia testified at trial that after reading the defendant his Miranda[2] rights, the defendant, he inquired about the defendant's vehicle because the police would have to secure the vehicle. The defendant informed Officer Tarzia that there was no vehicle because he had hitch-hiked to Mandeville from Slidell.
Based on the foregoing, any rational juror could have found the defendant had the specific intent to defraud the bank. The defendant had no account with Capital One Bank in Mandeville and nevertheless hitch-hiked from Slidell to cash a check with an out-of-place routing number and the misspelled name of the person authorized to sign the check. Based on the defendant's behavior inside the bank, it could have been reasonably inferred that the defendant knew he was trying to cash a fraudulent check and that the employees at the bank had discovered the fraudulence. When Geraldine took the check and I.D. to verify the information, the defendant immediately wanted the check and I.D. returned to him. When asked if this request concerned her, Geraldine testified, "Yes because usually people want their money, you know if it's a good check." When Geraldine went to the office, it was clear the defendant was becoming more agitated when he approached the office, knocked on the office window, and again demanded the return of the check and I.D. Finally, without ever having gotten his I.D. back, the defendant left the bank.
The defendant in brief suggests that he worked for someone named Travis Davis, that Travis paid him with this check, and that, as such, the defendant could not have known that the check was fraudulent. This hypothesis, however, was not established in any way at trial. The defendant did not testify and no other evidence, in any form, was offered to suggest that the defendant worked for a "Travis Davis" and was given a check by Travis. The only time during the State's case-in-chief that the name "Travis Davis" was mentioned was through questioning by defense counsel and in closing argument. Specifically, during the cross-examination of Melissa Capello, the following exchange took place:
Q. You don't know this man? You don't know Mr. Cousin?
A. No. I do not.
Q. And you don't know Travis Davis?
A. No. I do not.
Q. And your partner, the other manager, doesn't know Travis Davis?
A. No, sir.
Q. How did Travis, let's just for the sake of argument, let's just say there is a Travis Davis out there, okay. And that Travis Davis got hold of one of these checks. How would he do that?
A. There are mail boxes. There is any number of ways that-
During the cross-examination of Geraldine Johnson, the following exchange took place:
Q. Do you guys have a detail police officer there at the bank, ever?
A. No. We do not.
Q. Did you overhear any conversation of Mr. Cousin and the police? Did you overhear specifically, did you ever hear Mr. Cousin telling the police, hey, I got this check from a guy named Doug, or Gary or Greg or Travis, I got this check from a guy and there he goes in a red dually?
*960 A. No, but I mean if it is written to him why would he get it from someone else.
Q. We will figure that out. That's for them to decide....
In the defendant's case-in-chief, defense counsel attempted to establish a connection between Travis Davis and the defendant to no avail. The defendant's sole witness was Warren Fitzgerald, a former police officer who presently worked for the St. Tammany Parish District Attorney's Office as an Investigator. Fitzgerald's testimony established that defense counsel had given the prosecutor in this case the phone number of Travis Davis a week prior to trial. Fitzgerald called the number, which was a Georgia phone number. The man who answered the call identified himself as Travis Davis. According to Fitzgerald, Travis told him that he had never heard of Select Stone, LLC and that he (Travis) had no idea who the defendant was.
In closing argument, defense counsel stated the following regarding Travis Davis:
Another reasonable hypothesis is one that we have tried to bring out that the man did work, was paid for that work with that check by Travis Davis, who of course knows nothing about Desmond, knows nothing about him.
The phone number, the phone number that he was on, the person he was on the phone with on September 22nd in the bank, that's where that number came from that the District Attorney's Investigator looked up, Travis Davis, oh, I have never heard of him.
Accordingly, there was no evidence introduced at trial that showed the defendant worked for Travis Davis and was paid with a Select Stone, LLC company check. In any event, whatever hypotheses of innocence the defense managed to get across at trial, the jury rejected it. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Moten , 510 So.2d 55, 61 (La. App. 1st Cir.), writ denied, 514 So.2d 126 (La. 1987). In finding the defendant guilty, the jury clearly rejected the defense's theory of innocence that he tried to cash a check that he had worked for, and knew nothing about the check being a fake or forgery.
The jury heard the testimony, viewed the evidence presented at trial, and found the defendant guilty as charged. See Id. In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Higgins , 2003-1980 (La. 4/1/05), 898 So.2d 1219, 1226, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). Moreover, the trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt. State v. Taylor , 97-2261 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. State v. Mitchell , 99-3342 (La. 10/17/00), 772 So.2d 78, 83.
After a thorough review of the record, we find that the evidence supports the guilty verdict. We are convinced that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable *961 doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of bank fraud. See State v. Calloway , 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam ). Accordingly, the trial court did not err in denying the motion for postverdict judgment of acquittal.
These assignments of error are without merit.
ASSIGNMENT OF ERROR NO. 3
In his third assignment of error, the defendant argues that the trial court erred in adjudicating him a habitual offender. Specifically, the defendant contends the habitual sentencing was in error because he was denied the right to be tried, or to validly waive his right to be tried, as to the truth and validity of the charges pled in the habitual offender bill. The defendant further contends the trial court failed to inform him of his right to remain silent.
If, at any time, either after conviction or sentence, it shall appear that a person convicted of a felony has previously been convicted of a felony, the district attorney of the parish in which the subsequent conviction was had may file an information accusing the person of a previous conviction. La. R.S. 15:529.1(D)(1)(a). After a habitual offender bill of information is filed, the court in which the subsequent conviction was had shall cause the person to be brought before it and shall inform him of the allegation contained in the information and of his right to be tried as to the truth thereof according to law, and shall also require the offender to say whether the allegations are true. Id. The statute further implicitly provides that the court should advise the defendant of his right to remain silent. State v. Griffin , 525 So.2d 705, 706 (La. App. 1st Cir. 1988).
The defendant argues in brief that even if a defendant stipulates to the charges in a habitual offender bill of information, the trial court is still nevertheless required to advise the defendant of his statutory rights and his right to remain silent. Despite the defendant stipulating to the charges and admitting to the allegations, he contends in brief that his rights were violated because at the habitual offender hearing, the State did not offer any evidence to support the charges. The defendant further contends that at the hearing, the trial court "shunned" the defendant's objections, informing him it would be sentencing him "regardless of his protestations" based upon the representations of his attorney and the right of the State to bring the charges.
After the defendant was sentenced for the instant conviction of bank fraud, the State informed the trial court that it had filed a multiple offender bill of information, alleging the defendant was a third-felony habitual offender. Defense counsel, David Craig, waived the reading of the habitual offender bill of information and denied the charges. At the habitual offender hearing, Craig informed the trial court that he had reviewed the multiple offender bill of information with his client (the defendant). Craig noted the bill listed his present conviction of bank fraud and two previous convictions, one for possession of a Schedule II drug and one for aggravated burglary (two counts). Craig informed the trial court that the defendant admitted to the allegations; he further stated that the defendant is "in fact one in the same person that pled guilty to those prior crimes and was found guilty here." The trial court adjudicated the defendant a third-felony habitual offender, but deferred sentencing to a later date.
The defendant then expressed, it appears, some confusion about how the sentencing worked, particularly in light of the six-year sentence he had just received for *962 the bank fraud conviction. The trial court explained that the present proceeding was based on a habitual offender bill of information and that it would be setting a sentencing date. The following exchange then took place between the defendant and the trial court:
BY MR. COUSIN:
Right, but see that's the thing, like far as the these [sic] two charge[s], yes, I pled guilty to them because of the fact that my counsel doing the same thing I am hearing here. You got to take this deal or they do this that and the other. You know. I am like, I'm trying to see what I am against. I understand, yea, I went to trial, they found me guilty. You know what I am saying.
BY THE COURT:
We will deal with this another date. We are coming back on May 31st. We will deal with the sentencing on the multiple bill. That's where we are.
Based on the foregoing, we find the record indicates the defendant was merely confused about how sentencing worked under a habitual offender scheme and that he was, despite the defendant's assertion in brief, not shunned in any way by the trial court. We also find that despite the defendant's assertions, he was made aware of the specific allegations in the habitual offender bill of information and of his right to a formal hearing, as required under La. R.S. 15:529.1(D)(1)(a). That is, at the habitual offender hearing, defendant's own counsel (Craig), listed in open court and in the defendant's presence, the defendant's prior convictions. At sentencing for the underlying conviction, prior to the habitual offender hearing, after defense counsel waived the reading of the habitual offender bill of information, the trial court stated: "With that we will set a hearing. It needs to be at least fifteen (15) days from today's date."
We agree with the defendant, however, that he was never informed by the trial court of his right to remain silent. The State in brief concedes this point and agrees it is reversible error. Generally, the failure of the trial court to advise a defendant of his right to a hearing and his right to remain silent is not considered reversible error where the State has offered competent evidence of the defendant's status as a habitual offender at a hearing. State v. Bell , 2003-217 (La. App. 5th Cir. 5/28/03), 848 So.2d 87, 90. When the defendant's guilt, however, is proven by his own stipulation or admission without having been informed of his right to a hearing or his right to remain silent, by either the trial court or his attorney, there is reversible error. Id. The language of the Habitual Offender Law must be strictly construed. In this regard, an implicit and integral aspect of the requirements of La. R.S. 15:529.1 is the court's duty to inform the defendant of his right to remain silent. State v. Gonsoulin , 2003-2473 (La. App. 1st Cir. 6/25/04), 886 So.2d 499, 501 (en banc ), writ denied, 2004-1917 (La. 12/10/04), 888 So.2d 835.
In this case, while the defendant stipulated to his prior convictions and his identity, the State offered no competent evidence of the defendant's status as a habitual offender at the hearing. The State, in fact, offered no evidence at all. Accordingly, there was no proof introduced of the defendant's identity as to the alleged predicate offenses. The admission by the defendant without prior advisement of his right to remain silent and in the absence of any documentary proof by the State requires reversal of the habitual offender finding. See State v. Delaney , 42,990 (La. App. 2nd Cir. 2/13/08), 975 So.2d 789, 799-800. Cf. State v. Cook , 2011-2223 (La. 3/23/12), 82 So.3d 1239 (per curiam ) (where the Louisiana *963 Supreme Court found that the trial court adjudicated the defendant as a habitual offender on the basis of not only his stipulation, but also the documentary evidence introduced by the State at the hearing).
For the foregoing reasons, the defendant's habitual offender adjudication and enhanced sentence are vacated. The defendant's original sentence of six years at hard labor is reinstated, and the matter is remanded to the trial court for further proceedings.[3]
CONVICTION AFFIRMED; HABITUAL OFFENDER ADJUDICATION AND ENHANCED SENTENCE VACATED, AND ORIGINAL SENTENCE REINSTATED; REMANDED TO TRIAL COURT.

The defendant has prior convictions for possession of a Schedule II drug and aggravated burglary.

See Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The defendant is not protected by principles of double jeopardy from being tried again under the Habitual Offender Law. State v. Young , 99-1310 (La. App. 1st Cir. 4/17/00), 769 So.2d 12, 14.