**NOT DESIGNATED FOR PUBLICATION**

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NUMBER 2022 KA 0520

STATE OF LOUISIANA

VERSUS

MARKELL WOODS

**Judgment Rendered:** DEC 2 2 2022

* * * * * *

Appealed from the
Twentieth Judicial District Court
In and for the Parish of East Feliciana
State of Louisiana
Docket Number 19-CR-292
Honorable Kathryn E. Jones, Judge Presiding

* * * * * *

Samuel C. D'Aquilla
District Attorney
Jeanne Rougeau
Assistant District Attorney
Clinton, Louisiana

Holli Herrle-Castillo
Marrero, Louisiana

Markell Woods
Angola, Louisiana

Counsel for Appellee
State of Louisiana

Counsel for Defendant/Appellant
Markell Woods

Pro Se

* * * * * *

**BEFORE: WHIPPLE, C.J., GUIDRY, AND WOLFE, JJ.**

**GUIDRY, J.**

The defendant, Markell Woods, was charged by grand jury indictment with second degree murder (count one), a violation of La. R.S. 14:30.1, and attempted second degree murder (count two), a violation of La. R.S. 14:27 and La. R.S. 14:30.1. He pled not guilty to each count. After a trial by jury, he was found guilty of the responsive offense of manslaughter on count one, a violation of La. R.S. 14:31, and guilty as charged on count two. The State filed a habitual offender bill of information,[1] seeking to enhance the sentences on both counts. The defendant pled guilty to the habitual offender bill. The trial court then sentenced the defendant as a second-felony habitual offender to sixty years imprisonment at hard labor on count one and to twenty-five years imprisonment at hard labor on count two, and ordered that the sentence run consecutively. The defendant now appeals, assigning error in a counseled brief to the sufficiency of the evidence to support the convictions, the habitual offender adjudication, and the constitutionality of the sentences. The defendant further assigns error in a pro se brief to the State's opening remarks. For the following reasons, we affirm the convictions, habitual offender adjudication, and sentences.

## STATEMENT OF FACTS

On February 10, 2019, Clovis and Janet Matthews, the parents of the deceased victim Mitchell Matthews, were hosting a birthday party for their nine-year-old grandson at their home located at 10641 Roosevelt Street (a dead-end street) in Clinton. At the trial, Mrs. Matthews testified that they had "a yard full" of people, estimating there were thirty-five to forty adults and children present. Mr. and Mrs. Matthews testified that the party was held "right after church" and they were inside when they suddenly heard screams and gunfire. Before they

---

[1] The habitual offender bill of information sets forth predicate convictions in the Twentieth Judicial District Court for unauthorized use of a movable, on April 28, 2014, and for simple burglary, on April 25, 2016. The defendant pled nolo contendere to both predicate offenses.

2

could exit, Mitchell ran inside and collapsed, bleeding profusely. Mr. and Mrs. Matthews testified that they heard more gunshots after Mitchell entered the home. They looked out the door and saw the vehicle that the shooter was in, a white Honda Accord. Mrs. Matthews noted their mobile home was "shot up" during the incident, specifying that about three or four shots were fired into the home. Mr. Matthews noted that he saw the car when it "spurted off," adding that the shooter "was still shooting." They could not see who was in the car, but they recognized the vehicle from previously seeing Clyde Toney driving it with the defendant as a passenger.

Lieutenant Kevin Garig with the East Feliciana Parish Sheriff's Office (EFPSO), the lead detective for the case, responded to the scene. Detective Garig recovered and collected .45 Auto caliber cartridges at the scene and noted bullet damage to two vehicles, including the vehicle that belonged to the second shooting victim, Wendell Beckwith. Detective Garig noted that Wendell's vehicle had visible bullet holes to a seat surrounded by blood and that he contacted Wendell while he was hospitalized. Detective Garig collected a bullet removed from Wendell's leg during surgery. Detective Garig testified that the evidence collected during his investigation of the incident implicated Clyde as the driver and the defendant as the passenger. Clyde was arrested and interviewed, and his vehicle, the white Honda Accord, was searched. During the search of the Honda Accord, a fired bullet was recovered from underneath the backseat on the driver's side. Detective Garig confirmed that he further determined that the weapon used in the shooting belonged to Clyde.

Cheryl Swearingen of the Louisiana State Police Crime Lab, an expert in firearm and crime scene examination, examined the evidence collected in this case, consisting of four cartridge cases, one live round, one cartridge, and three bullets (one recovered from the front yard of the Matthews residence, one recovered from

3

Wendell's leg, and one recovered from Clyde's vehicle). She determined that all of the cartridge casings were shot from the same firearm. The bullets were too damaged to determine if they were fired from the same weapon, but they were of the same caliber, .45 Auto, and had some of the same individual characteristics. She did not have a weapon to test in this case but confirmed that a .45 caliber weapon would be of interest.

Mitchell's autopsy was performed by Dr. Christopher Tape,[2] an expert in the field of Forensic Pathology. Dr. Tape testified that Mitchell died from gunshot wounds to the body, including his upper left chest. Mitchell's only other visible injury was a small laceration or skin tear under his left eyebrow.

## COUNSELED ASSIGNMENT OF ERROR NUMBER ONE

In counseled assignment of error number one, the defendant argues his actions were committed in self-defense and defense of others. The defendant states that he is not challenging the statutory elements of the offenses or his identity as the perpetrator but maintains that he proved by a preponderance of the evidence that the shooting was committed in self-defense. The defendant notes he testified at trial that a few weeks before the incident in question, Mitchell shot a gun at him. Thus, the defendant claims that he shot Mitchell because Mitchell punched Clyde, and he was afraid that Mitchell had a weapon as he did before. The defendant insists that he did not instigate the altercation and argues that since Clyde was driving, he had no control over the vehicle being stopped. He also insists he only fired the gun after Mitchell attacked Clyde, fearful that Mitchell would shoot at them. The defendant notes that Mitchell was significantly taller than him and

---

[2] Dr. Tape noted that a green leafy substance consistent with marijuana was recovered from one of Mitchell's shoes and methamphetamine (metabolized or a contaminate of the production of methamphetamine), amphetamine, marijuana, and a small amount of alcohol (.015 %) were found in Mitchell's system during the toxicology screen.

4

Clyde and that Clyde was unsuccessful in defending himself in the fist fight.[3] The defendant argues that his use of force was reasonable under the circumstances.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for sufficiency of the evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime beyond a reasonable doubt. See La. C.Cr.P. art. 821(B); Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Ordodi, 06-0207, p. 10 (La. 11/29/06), 946 So. 2d 654, 660. The Jackson standard of review, incorporated in Article 821(B), is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. State v. Patorno, 01-2585, p. 5 (La. App. 1st Cir. 6/21/02), 822 So. 2d 141, 144. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. James, 17-1253, p. 6 (La. App. 1st Cir. 2/27/18), 243 So. 3d 717, 721, writ denied, 18-0419 (La. 1/8/19), 259 So. 3d 1024.

The offense of manslaughter includes the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm," but the killing "is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La. R.S. 14:31(A)(1). Second degree murder is the killing of a human

---

[3] The defendant notes that he is five feet and four inches tall and weighs one hundred forty pounds, Clyde is five feet and nine inches tall, and, as Dr. Tape testified, Mitchell was approximately six feet tall and weighed approximately one hundred sixty-five pounds.

being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose. La. R.S. 14:27(A). A specific intent to kill is an essential element of the crime of attempted murder. State v. Currie, 20-0467, p. 6 (La. App. 1st Cir. 2/22/21), 321 So. 3d 978, 982. Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. Currie, 20-0467 at pp. 6-7, 321 So. 3d at 982-83.

Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. Moreover, under the doctrine of transferred intent, when a person shoots at an intended victim with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing or inflicting of great bodily harm would have been unlawful against the intended victim, then it would be unlawful against the person actually shot, even though that person was not the intended victim. State v. Henderson, 99-1945, p. 3 (La. App. 1st Cir. 6/23/00), 762 So. 2d 747, 750-51, writ denied, 00-2223 (La. 6/15/01), 793 So. 2d 1235. The discharge of a firearm in the direction of a crowd of innocent bystanders has repeatedly been recognized by Louisiana courts as sufficient to prove specific intent to kill. State v. Collins, 09-2102, p. 13 (La. App. 1st Cir. 6/28/10), 43 So. 3d 244, 251, writ denied, 10-1893 (La. 2/4/11), 57 So. 3d 311, cert. denied, 565 U.S. 818, 132 S.Ct. 99, 181 L.Ed.2d 27 (2011).

A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(A)(1). In a non-homicide case, a claim of justification requires a dual inquiry: (1) an objective inquiry into whether the force was reasonable under the circumstances; and (2) a subjective inquiry into whether defendant believed that force was apparently necessary. See La. R.S. 14:19(A)(1)(a); State v. Dardar, 21-0860, p. 9 (La. App. 1st Cir. 2/25/22), 340 So. 3d 1110, 1117, writ denied, 22-00533 (La. 5/24/22), 338 So. 3d 1192. It is justifiable to use force or violence or to kill in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person. La. R.S. 14:22. However, a person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. La. R.S. 14:21.

For appellate purposes, the standard of review of a claim of self-defense is whether or not a rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could find beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Evans, 10-0013, p. 5 (La. App. 1st Cir. 5/7/10), 2010 WL 1838469, at *2, writ denied, 10-1321 (La. 1/7/11), 52 So. 3d 883. When a defendant claims self-defense in a homicide case, the State has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. State v. Griffin, 07-0401, p. 7 (La. App. 1st Cir. 2/8/08), 2008 WL 426490, at *3, writ denied, 08-0666 (La. 10/10/08), 933 So. 2d 1281. Louisiana law is unclear as to who has the burden of proving self-defense in a non-homicide case, and what the burden is. State v. Barnes, 590 So. 2d 1298, 1300 (La. App. 1st

Cir. 1991). As we noted in State v. Serigny, 19-0958, p. 4 (La. App. 1st Cir. 1/9/20), 2020 WL 104684, at *2, because this issue has never been resolved by our supreme court, this circuit has similarly left the issue unresolved. See State v. Freeman, 427 So. 2d 1161, 1162-63 (La. 1983). In previous cases, this court has analyzed the evidence under both standards of review, which is whether the defendant proved self-defense by a preponderance of the evidence or whether the State proved beyond a reasonable doubt that the defendant did not act in self-defense. State v. Mollerberg, 18-0256, p. 9 (La. App. 1st Cir. 9/24/18), 260 So. 3d 599, 605-06. In this case, similar to our approach in Mollerberg, as to count two, we do not decide the issue of who has the self-defense burden because under either standard the evidence established the defendant did not act in self-defense. See State v. Thomas, 19-0409, pp. 9-10 (La. App. 1st Cir. 10/25/19), 289 So. 3d 1030, 1039.

In the instant case, at trial, Allison Young testified that she was in Clinton on Roosevelt Street, visiting her sister-in-law on the date of the instant offenses. She testified that she saw the vehicle at issue drive through the subdivision at least twice that day. The second time that she saw the vehicle, around 5:00 p.m., it came into the subdivision, went around the loop, and came back towards the subdivision exit. She stated that two male occupants were in the vehicle including the driver, who had "dreads" and was "bright[,]" and the passenger, who brandished a black gun.

Francina Coston, Mitchell's aunt, was at the party at the Matthews' residence at the time of the shooting. Francina testified that she saw Mitchell and his sister, Breianna, talking to two men beside a white vehicle that was parked facing the exit of the subdivision. She stated that she entered the Matthews' residence then heard gunshots. She testified that she went to the door and saw a film of smoke when Breianna ran inside with her son, followed by Mitchell, who

8

fell to the floor as Mrs. Matthews approached him. Francina continued to hear the sound of gunshots, which she described as "boom, boom, boom."

Mitchell's niece, Arelle Washington, was also at the party at the Matthews' residence at the time of the shooting. She testified that she was outside and was six feet away from her uncle when Clyde and the defendant pulled up in a car. When she saw the car, it was facing the subdivision exit and was partly on the grass and partly on the road. Arelle testified that she was not sure who exited the vehicle first, as she must have gone inside at that time, but was outside at the point that "[Clyde] and my uncle were fighting." She saw the defendant with a black gun, partly wrapped in a bandana "like ... around ...the front and ... almost the handle part." When asked if she heard them say anything to each other, Arelle stated that she heard her aunt say something and that the defendant and her uncle had words, but she could not hear what was being said. She stated that as Clyde and Mitchell were fighting, Clyde "fell back a little bit." Clyde then went back to the driver's side of the car and stood there, as the defendant pointed the gun at Mitchell. Arelle heard the defendant say that he "didn't have anything to live for and he didn't care" before he shot Mitchell.

Arelle confirmed that Clyde was getting back in the vehicle when the defendant and the victim were arguing. She further confirmed that there was nothing blocking Clyde's vehicle or preventing him and the defendant from leaving and that she did not see Mitchell with a gun. After the defendant started shooting, her aunt and uncle ran toward the house. She said she ran toward the house also, "but [the defendant] kept shooting." She stated that the defendant was initially outside of the car when he was shooting. She noted that the defendant must have re-entered the car, because when she made it into the home and looked back outside, the defendant was still shooting from the car as it drove away.

Wendell, the surviving shooting victim, also testified at trial. Mitchell was his cousin. Wendell testified that he was outside at the time of the shooting, and his truck was parked in front of the Matthews' residence. When the shooting began, he ran to his truck. After entering his truck, he realized he had been struck by a bullet in his groin area. Just prior to the shooting, he saw the white Honda Accord when it entered the subdivision. As it was coming back out, it stopped, and Clyde and the defendant "almost like simultaneously" jumped out of the car. He specified that though it was almost simultaneous, Clyde jumped out first and ran around the vehicle. By the time Clyde got to the side where he had a "confrontation" with Mitchell, who was standing in the driveway at the time, the defendant stepped out with a handgun. Wendell confirmed that he saw Clyde and Mitchell have a brief fist fight before Clyde ran back to his car. At that point, Wendell saw the defendant with the pistol raised and ran to his truck. Wendell stated that when the defendant started shooting "everybody – everything went crazy." He stated, "I heard two or three more shots. Doom, doom, doom, as they pull off. When he pull [sic] off, he shot till he passed the – the residence. In that ... sequence of shooting that's when I got hit."

On cross examination, Wendell read a portion of his pretrial statement in which he, in part, stated that he heard Breianna say "Oh, there they go" as the car passed. As the situation was escalating, he attempted to tell Mitchell to "[l]eave stuff alone." He further stated that he did not feel right about the situation and decided to leave. He added, "By the time I made it to my truck I could not remember if it was a scuffle or whatever, but all I can remember it was the boom, boom, boom." After reading the statement, Wendell recalled telling Mitchell before the altercation to "Come from by the road. Leave that stuff alone." He noted that Mitchell instead remained in the driveway where the altercation took place. He reiterated that the defendant kept shooting even as the car sped off.

Alex Moses, another cousin of Mitchell, was also present at the time of the shooting. Alex was standing next to Mitchell when the "little white car" pulled up and when the shooting occurred. Moses testified that he knew the defendant and Clyde, and saw Clyde got out of the car first, armed with a black automatic or semiautomatic gun. Clyde and Mitchell had words, and Alex tried to talk Mitchell into retreating, saying, "Come on, Man, let's go." Clyde came running around the car, Mitchell hit him, and Clyde fell down. As Clyde was lying down at his back tire, Alex heard, "Pow, pow, pow."

Zhylan Beverly, Mitchell's nephew, was also outside when the shots were fired. Zhylan denied that anyone broke the windshield or blocked the car. He further testified that the defendant got out of the car first with a gun in his hand, and then Clyde got out, came around the car, had words with Mitchell, fell back when they started fighting, got back up, and went back to the driver's side of his vehicle. He added, "And then that's when my uncle turnt [sic] around back to Markell Woods. And then that's when Markell start[ed] shooting. And, when [Mitchell] got shot, him and my Auntie they ran back toward the house." Zhylan testified that he heard more gunshots as the car drove away.

Breianna Matthews, Mitchell's sister, testified that no one told Clyde to stop, and nothing was blocking his vehicle. Breianna testified that when the car stopped, the defendant got out first with a gun in his hand. Breianna asked the defendant what was going on, and the defendant said he was tired of Mitchell bothering Clyde. When Clyde got out of the driver's side and came around to the other side of the car, the defendant was standing there ready to shoot. Breianna stated she told the defendant, "Yo ... you don't have to do this. ...You got too much to live for." She added, "He was like, he don't give a – you know, he don't have nothing to live for." Clyde and Mitchell exchanged blows. Clyde was knocked down, got up, and went back to the driver's side of the vehicle. The defendant then began

shooting. She and Mitchell looked at each other and took off running. Breianna further said that her brother was fighting with Clyde but not the defendant.

Clyde testified that Mitchell was his friend and relative. Clyde admitted that he lied to the police during his first interview. He confirmed that he was offered an agreement to plead guilty to obstruction of justice and would be sentenced to ten years imprisonment in exchange for truthful testimony in this case. Clyde testified that when he saw Mitchell earlier that day, before the shooting, they were getting along fine. Clyde further testified that just moments before the shooting, he had driven to the back of the subdivision and was on his way out when Mitchell and Breianna stopped him. Clyde stated that someone threw something at his windshield and cracked it. He confirmed that he exited the car first, stating that he wanted to see what was going on, but Mitchell hit him. He heard the shooting after he walked back to his side of the vehicle. He confirmed that it was his gun that was used in the shooting. He then got back in the car and drove off. When confronted with his police statement, Clyde confirmed that he told the police that he did not know whether or not his windshield had been hit by gunfire.

Clyde further testified that he was scared that night and at trial was still a little scared of the defendant. He stated that after the shooting, as they drove off, the defendant said he was "gonna take his lick," which meant he would own up to what he did. According to Clyde, the defendant further threatened to kill him if he told anyone what happened. Clyde confirmed that he had spent time around Mitchell before and confirmed seeing him carrying a gun in the past. However, he denied seeing Mitchell with a gun on the day in question.

The defendant testified that when Clyde picked him up that day they drove around. When they initially drove to the subdivision where the shooting later occurred, they got out of the vehicle, Clyde had an argument with Mitchell, and they left. He testified that they continued riding around and did not stop again

12

until he saw Mitchell at the end of road, and something hit Clyde's windshield. He stated that Clyde got out of the car first. The defendant further testified, "Um, [Clyde] and Mitch was in the road. They was fighting and I got out. And I shot Mitch." The defendant stated he did not know why Clyde and Mitchell were fighting, but Clyde's windshield was hit before Clyde stopped the vehicle.

When asked why he shot Mitchell, the defendant testified he was afraid of Mitchell and was trying to protect himself and Clyde. He further explained that two weeks before the instant incident, Mitchell pulled out a gun and started shooting at him. The defendant stated that he ran and did not report the incident because he was afraid of Mitchell retaliating. The defendant testified that on the day in question, he stepped out of the car with Clyde's gun because he thought Mitchell might have a gun and might shoot at him again. The defendant said he did not intend to hurt Mitchell, nor did he think that Mitchell would die. The defendant further stated he "just pulled the trigger" because he "just wanted to protect" himself and Clyde. When asked what happened after he fired the gun, the defendant testified, "I kept shooting because I seen other people and ain't know who it was, and ain't know whether they had something or not. Because something had already hit the car and it was loud ... we ain't know whether somebody shot at the car or what it was."

In finding the defendant guilty, it is clear the jury rejected the claims of self-defense and defense of another person and concluded that the use of deadly force under the particular facts of this case was neither reasonable nor necessary. The jury can accept or reject the testimony of any witness. To resolve conflicting testimony relative to factual matters, the jury must make credibility determinations and weigh the evidence. See State v. Mire, 14-2295, p. 4 (La. 1/27/16), 269 So. 3d 698, 700 (per curiam). The Jackson standard of review does not permit a reviewing court to substitute its own appreciation of the evidence for the

13

factfinder's, assess the credibility of witnesses, or reweigh evidence. State v. McGhee, 15-2140, p. 2 (La. 6/29/17), 223 So. 3d 1136, 1137 (per curiam); State v. Calloway, 07-2306, p. 10 (La. 1/21/09), 1 So. 3d 417, 422 (per curiam).

While the defendant claims he shot in self-defense and in defense of Clyde, considering the evidence, we find that the jury could have rationally concluded that the defendant was the aggressor. The State presented eyewitness testimony to show the defendant was brandishing a gun prior to the shootings. Although the defendant testified that he was afraid of Mitchell, he and Clyde admitted to repeatedly driving in the area where they knew Mitchell lived and could be found. Several witnesses stated that the defendant and Clyde willingly stopped their vehicle and exited, without any prompting. Mitchell was unarmed, and there was no evidence that Mitchell's actions placed the defendant or Clyde in imminent danger of losing their life or receiving great bodily harm such that deadly force was necessary. The defendant continued to fire the gun even after Mitchell and others fled. There was no indication that anyone in the crowd posed a threat to the defendant or Clyde. Thus, it was reasonable for the jury to find that the defendant had the specific intent to kill or to inflict great bodily harm on Mitchell, and, furthermore, that the specific intent to kill Wendell could be transferred from Mitchell and inferred from the defendant's actions of shooting into the crowd. Further, Clyde stopped the vehicle to confront the victim. Thus, Clyde, a fellow aggressor, could not have justifiably used deadly force himself; therefore, the defendant was not entitled to use deadly force in Clyde's defense. See La. R.S. 14:22; Dardar, 21-0860 at p. 10, 340 So. 3d at 1118.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See Calloway, 07-2306 at pp. 1-2, 1 So. 3d at 418. A court

14

of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law in accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder. See Mire, 14-2295 at p. 8, 269 So. 3d at 703. After a thorough review of the record, we are convinced that a rational trier of fact, viewing the evidence in the light most favorable to the State, could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of manslaughter and attempted second degree murder. Counseled assignment of error number one lacks merit.

## COUNSELED ASSIGNMENT OF ERROR NUMBER TWO

In counseled assignment of error number two, the defendant asserts that prior to the habitual offender arraignment, the trial court failed to advise him of his right to remain silent and his right to a hearing in which the State had to prove his prior convictions. Thus, the defendant argues his stipulation to the habitual offender bill of information must be vacated.

If, at any time, either after conviction or sentence, it shall appear that a person convicted of a felony has previously been convicted of a felony, the district attorney of the parish in which the subsequent conviction was had may file an information accusing the person of a previous conviction. La. R.S. 15:529.1(D)(1)(a); State v. Piper, 18-1796, p. 17 (La. App. 1st Cir. 9/27/19), 287 So. 3d 13, 25. Louisiana Revised Statutes 15:529.1(D)(1)(a) provides that, upon the filing of a multiple offender bill of information, the court in which the subsequent conviction was had shall cause the person to be brought before it and shall inform him of the allegation contained in the information and of his right to be tried as to the truth thereof according to law and shall also require the offender to say whether the allegations are true. The statute further implicitly provides that

15

the court should advise the defendant of his right to remain silent. Piper, 18-1796 at p. 17, 287 So. 3d at 25-26.

Herein, at a post-trial motions hearing, the State gave notice to the defense in open court that it had filed a habitual offender bill of information and a hearing date had been set. While the habitual offender hearing was set for a later date, the State indicated that the defendant could admit or deny the allegations at that time. However, defense counsel declined, explaining that she had not reviewed the bill. Subsequently, at the habitual offender hearing, defense counsel stated that she had the opportunity to review the bill and to discuss it with the defendant. The clerk then read the habitual offender bill of information, noting attached exhibits as to each of the two predicates. The defendant was then asked how he wanted to plead, and he pled guilty. The trial court accepted the plea and set a date for sentencing. The trial court later sentenced the defendant as a second-felony habitual offender.

The language of the Habitual Offender Law must be strictly construed. In this regard, an implicit and integral aspect of the requirements of La. R.S. 15:529.1 is the court's duty to inform the defendant of his right to remain silent. Generally, the failure of the trial court to advise a defendant of his right to a hearing and his right to remain silent is not considered reversible error where the State has offered competent evidence of the defendant's status as a habitual offender at a hearing. When the defendant's guilt, however, is proven by his own stipulation or admission without having been informed of his right to a hearing or his right to remain silent, by either the trial court or his attorney, there is reversible error. State v. Cousin, 17-1135, pp. 13-14 (La. App. 1st Cir. 12/21/17), 240 So. 3d 954, 962, writ denied, 18-0184 (La. 11/5/18), 255 So. 3d 1049.

In this case, while the defendant stipulated to his prior convictions (and presumedly his identity), the State offered competent evidence of the defendant's status as a habitual offender at the hearing, including the minute entries, bills of

16

information, and transcripts of the prior convictions. Accordingly, the State offered competent evidence of the defendant's status as a habitual offender. On the record before us, we find that the defendant's interests were fully protected and any technical non-compliance with the statutory directives in La. R.S. 15:529.1(D)(1)(a) was harmless. See State v. Cook, 11-2223, p. 2 (La. 3/23/12), 82 So. 3d 1239, 1240 (per curiam) (where the Louisiana Supreme Court found that the trial court adjudicated the defendant as a habitual offender on the basis of not only his stipulation, but also the documentary evidence introduced by the State at the hearing). Thus, we find no merit in counseled assignment of error number two.

## COUNSELED ASSIGNMENT OF ERROR NUMBER THREE

In counseled assignment of error number three, the defendant argues that although the sentences are within the statutory limits, they are excessive in this case. The defendant acknowledges the trial court considered La. C.Cr.P. art. 894.1, but contends the court failed to provide particular justification for imposing consecutive sentences. He argues the trial court failed to give weight to letters written by his family or consider mitigating factors that he acted in defense of another person, attempted to de-escalate the situation prior to the shooting, and has non-violent prior convictions. He further argues his youthful age, twenty-two years old at the time of the offenses, provides an opportunity for rehabilitation.

The sentencing hearing transcript reveals that the defendant did not object to the sentence, nor did he file a motion to reconsider sentence thereafter. See La. C.Cr.P. art. 881.1(A)(1) ("[i]n felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence"). Under La. C.Cr.P. arts. 881.1(E) and 881.2(A)(1), the failure to make or file a motion to reconsider sentence shall preclude a defendant from raising an objection to the sentence on appeal, including a claim of excessiveness. See State

17

v. Thames, 15-1298, p. 7 (La. App. 1st Cir. 9/19/16), 2016 WL 5118581, at *4, writ denied, 16-1911 (La. 9/6/17), 224 So. 3d 981. Thus, review of the excessive sentence claim is procedurally barred.

## PRO SE ASSIGNMENT OF ERROR

In the sole pro se assignment of error, the defendant argues the State made prejudicial remarks during its opening statements. Specifically, the defendant argues the State exceeded the scope of an opening statement "by putting jurors in a life-like situation to play upon [their] emotions and defer from the facts of the case." He argues the inflammatory remarks caused prejudice so severe that it "infects" his due process rights "with an incurable disease." The defendant further argues that the State used distorted facts and evidence as a "magic trick" to deceive the jurors.

The State's opening statement "shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the [S]tate expects to prove the charge." La. C.Cr.P. art. 766. The opening statement is designed to inform the jury so they may understand the evidence as it unfolds and to protect a defendant from surprise. Even if the prosecutor exceeds these bounds, an appellate court will not reverse a conviction if not thoroughly convinced that the argument influenced the jury and contributed to the verdict. State v. Brown, 20-0150, p. 26 (La. App. 1st Cir. 2/19/21), 2021 WL 650816, at *12, writ denied, 21-00458 (La. 6/1/21), 316 So. 3d 835. However, statements made outside the permissible scope of an opening statement could result in a mistrial under La. C.Cr.P. arts. 770 and 771. State v. Banks, 09-0052, p. 5 (La. App. 1st Cir. 6/12/09), 2009 WL 1655006, at *2, writ denied, 09-1609 (La. 3/12/10), 28 So. 3d 1024.

In this case, the defendant complains of the following specific portion of the State's opening statement:

18

Thank you, Your Honor. Ladies and Gentlemen of the jury, thank you for being here and serving today. Um, first if you can, I want [you] to picture in your mind, it's a beautiful sunny day. You're having your seven year old son's party in your yard, or your seven year old nephew, or your grandson. Uh, there's numerous family members. You've got friends everywhere. They're going in and out of your home. They're mingling. Uh, you're having a great time. There are children everywhere.

Now, after thinking about that, think about what it sounds like to hear your world end. Do any of you know what that sounds like? Mrs. Janet Matthews knows. It sounds like gunshots ripping through your grandson's party. It's seeing your son run into the front door and fall on the floor. It's holding your son's head in your lap while you're attempting to apply pressure to his wounds, and listening to his shallow breathing as the detective is trying to help you save him. It's seeing your son unable to answer those questions from the detectives as he lies dying on your lap in your living room floor.

There was no objection to the State's opening statement. Thus, the alleged error was not preserved for review. See La. C.Cr.P. art. 841(A) ("[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence"). One of the purposes of the contemporaneous objection rule is to allow a trial judge to immediately have notice of an alleged irregularity so that he may cure the problem and thus avoid a mistrial or reversal.

Where a defendant does not object to remarks by the prosecutor, ask for an admonition, or move for a mistrial, he cannot raise such issues on appeal. See La. C.Cr.P. arts. 771 and 841(A); State v. Dilosa, 01-0024, p. 21 (La. App. 1st Cir. 5/9/03), 849 So. 2d 657, 673, writ denied, 2003-1601 (La. 12/12/03), 860 So. 2d 1153. Therefore, this argument cannot be raised for the first time on appeal. Accordingly, the issue raised in the pro se assignment of error was not preserved for review.

**CONVICTIONS, HABITUAL OFFENDER ADJUDICATION, AND SENTENCES AFFIRMED.**

19