STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2024 KA 0030

STATE OF LOUISIANA

VERSUS

CORDALE RICHARD

Judgment Rendered: _____MAR 2 1 2025_____

* * * * * * *

On Appeal from the 17th Judicial District Court
In and for the Parish of Lafourche
State of Louisiana
Trial Court No. 598988

Honorable Marla M. Abel, Judge Presiding

* * * * * * *

Kristine Russell                          Attorneys for Appellee
District Attorney                         State of Louisiana
Allie Fournet
Joseph S. Soignet
Assistant District Attorneys
Thibodaux, Louisiana

Jane Hogan                                Attorney for Defendant/Appellant
Hammond, Louisiana                        Cordale Richard

* * * * * *

**BEFORE: PENZATO, STROMBERG AND CALLOWAY,[1] JJ.**

---

[1] Judge Curtis A. Calloway, retired, serving ad hoc by special appointment of the Louisiana Supreme Court.

*Penzato, J., concurs*

**CALLOWAY, J.**

The defendant, Cordale Richard, was charged by grand jury indictment with two counts of second degree murder, violations of La. R.S. 14:30.1, and pled not guilty. He subsequently filed a motion to suppress his confession, followed by a motion to determine his capacity to stand trial. The trial court appointed a sanity commission, held a hearing, found the defendant competent to proceed, and later denied the motion to suppress. After a subsequent jury trial, the defendant was found guilty as charged on each count. He filed a motion for a new trial and a motion for post-verdict judgment of acquittal, both of which the trial court denied. He was sentenced on each count to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence, to be served concurrently. He now appeals, challenging the trial court's sanity ruling, the trial court's denial of his motion to suppress, and the sufficiency of the evidence. For the following reasons, we affirm the convictions and sentences.

## STATEMENT OF FACTS

On June 14, 2020, Aliza Gabriel and Tanasa Francis were shot and killed at a party with hundreds of attendees, in the 700 block of St. Louis Street in Raceland, Louisiana. Deputy Drake Duet, a patrol deputy for the Lafourche Parish Sheriff's Office (LPSO) at the time, arrived at the scene before the shooting, in response to a fight in progress. As Deputy Duet advanced through a crowd of onlookers, he observed a rifle-type firearm in the waistband of one of the individuals participating in the fight. Deputy Duet then announced his presence, and the fighters dispersed into the crowd. He then contacted responding officers in route and notified them of the presence of a firearm at the scene.

As Deputy Duet was briefing two of the responding officers, Deputy Jonathan Crabtree and Lieutenant Michael Beck of the LPSO, gunshots were fired in the distance, followed seconds later by a closer round of gunfire, during which

2

Gabriel and Francis were killed. Jergens Berryhill, an eyewitness, attended the party with friends. When the fight broke out, Berryhill and her friends returned to their vehicle where Berryhill witnessed the second round of gunshots. As they drove off, Berryhill saw the two bodies on the ground.

Berryhill identified the defendant as the shooter in a Crime Stoppers tip and in a subsequent photographic lineup. A warrant was then executed for the defendant's arrest at which point he was transported to the Criminal Operations Center in Lockport. After being advised of his **Miranda**[2] rights, the defendant executed a waiver of rights form and participated in a recorded interview. The defendant confessed to the shooting, specifically with a .40 caliber pistol, but stated he did not mean to hurt anyone.

## SUFFICIENCY OF THE EVIDENCE

In assignment of error number three, the defendant argues the evidence was insufficient to support the convictions of second degree murder. He argues one of the police dash cam videos purportedly showing him at the scene is grainy, the depicted individual's facial features are indiscernible, and the individual appears to be wearing shoes of a different color than the ones the defendant wore that night. He also argues Berryhill's testimony was inconsistent with the physical evidence. Further, he argues his statement was insufficient to support the verdicts.

When issues are raised on appeal contesting the sufficiency of the evidence and alleging trial error, the reviewing court should first determine the sufficiency of the evidence. **State v. Hearold**, 603 So.2d 731, 734 (La. 1992); **State v. Duhon**, 2018-0593 (La. App. 1st Cir. 12/28/18), 270 So.3d 597, 609, writ denied, 2019-0124 (La. 5/28/19), 273 So.3d 315. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under **Hudson v. Louisiana**, 450 U.S. 40, 43, 101 S.Ct. 970, 972, 67 L.Ed.2d 30 (1981), if a rational trier of

---

[2] See **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3

fact, viewing the evidence in accordance with **Jackson v. Virginia**, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the State, could not reasonably conclude the elements of the offense have been proven beyond a reasonable doubt. **Hearold**, 603 So.2d at 734; **Duhon**, 270 So.3d at 609. When the entirety of the evidence is insufficient, the accused must be discharged of that crime, and any discussion of trial error would be pure dicta, as those issues are moot. However, when the entirety of the evidence is sufficient to support the conviction, the reviewing court must then consider the other assignments of error. **Hearold**, 603 So.2d at 734; **Duhon**, 270 So.3d at 609.

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt. See La. Code Crim. P. art. 821(B); **Jackson**, 443 U.S. at 319, 99 S.Ct. at 2789; **State v. Coleman**, 2021-0870 (La. App. 1st Cir. 4/8/22), 342 So.3d 7, 11, writ denied, 2022-00759 (La. 11/21/23), 373 So.3d 460.

The **Jackson** standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. **State v. Welch**, 2019-0826 (La. App. 1st Cir. 2/21/20), 297 So.3d 23, 27, writ denied, 2020-00554 (La. 9/29/20), 301 So.3d 1193. When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude

4

beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. **State v. Currie**, 2020-0467 (La. App. 1st Cir. 2/22/21), 321 So.3d 978, 982.

When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. **State v. Southall**, 2022-0746 (La. App. 1st Cir. 6/2/23), 369 So.3d 925, 930, writ denied, 2023-00875 (La. 2/6/24), 378 So.3d 750.

Second degree murder is defined, in pertinent part, as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Because it is a state of mind, specific intent need not be proven as a fact, but may be inferred from circumstances surrounding the offense and the defendant's actions. For example, specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. **State v. Livous**, 2018-0016 (La. App. 1st Cir. 9/24/18), 259 So.3d 1036, 1040, writ denied, 2018-1788 (La. 4/15/19), 267 So.3d 1130. Further, the discharge of a firearm in the direction of a crowd of innocent bystanders is sufficient to prove specific intent to kill, even if no intended victim is identified. **State v. Collins**, 2009-2102 (La. App. 1st Cir. 6/28/10), 43 So.3d 244, 251-52, writ denied, 2010-1893 (La. 2/4/11), 57 So.3d 311, cert. denied, 565 U.S. 818, 132 S.Ct. 99, 181 L.Ed.2d 27 (2011).

In this case the defendant does not deny that Gabriel and Francis were murdered, but instead challenges his identity as the shooter. When the key issue is

5

the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. A positive identification by only one witness is sufficient to support a conviction. **State v. Bessie**, 2021-1117 (La. App. 1st Cir. 4/8/22), 342 So.3d 17, 23, writ denied, 2022-00846 (La. 9/20/22), 346 So.3d 802.

At trial, Deputy Duet, Deputy Crabtree, and Lieutenant Beck testified regarding an encounter with the defendant just prior to the shooting. Specifically, Deputy Duet testified that as he was leading the other officers to the location of the fight, the defendant bumped into him and used explicit language in telling him to watch where he was going. All three of the officers testified the defendant was wearing a Dickie's khaki button up shirt, and a white t-shirt underneath. Deputy Duet testified the initial round of gunshots, in the distance, were fired approximately thirty seconds after the encounter. Deputy Duet further testified the initial distant round of shots were fired from the north end of St. Louis Street, at or toward the Meadow Lane intersection, and seemed to have been fired from a high-powered rifle, while the second round of gunshots were fired from a different type of gun.

Deputy Crabtree similarly testified the gun fired in the distance sounded like a high caliber rifle and came from the north, toward Highway 1. Noting he had experience shooting and was certified in firearms, he further observed that there was a large amount of people between his position and the initial gunfire, based on the "crack of the rifle sound" and the "higher pitch" of the rifle. He testified the shots were rapid and likely fired from a fully loaded automatic weapon. He did not see anyone get shot from that initial round of gunfire. He and Deputy Duet began to run south, toward Buford Street, attempting to locate the shooter.

Deputy Crabtree testified they heard the second round of gunfire while moving toward Buford Street, consisting of approximately eight gunshots fired

within a very close proximity, coming from the Buford Street intersection, on the south end of St. Louis Street. He further testified this time the firearm had the distinct sound of a pistol. Deputy Crabtree heard a whistling sound and saw one of the females, who was a shoulder length away and moving toward Buford Street, drop to the ground. Deputy Crabtree testified he saw the other female laying on the ground toward a fence.

Lieutenant Beck testified that his dash cam captured the defendant just before the second round of gunfire, walking westbound on St. Louis Street and then turning to proceed northbound. The dash cam video shows the defendant then appearing to be manipulating something in his hand. The defendant stepped out of the camera's view, seconds before audible gunshots were fired. After the gunshots were fired, the footage shows the defendant running and appearing to put something in his pants. The footage and still shots show the defendant wearing khaki pants, a khaki shirt, and a white undershirt.[3]

At approximately 12:51 a.m., Sergeant Terry Poiencot, a crime scene investigator with the LPSO, was dispatched to investigate and photograph the scene of the shooting. He testified .40 caliber casings were located within the vicinity of the females' bodies. Specifically, a .40 caliber casing was located approximately twenty-five yards from one of the bodies, and thirty-five yards from the other body, and additional .40 caliber casings were surrounding them. Sergeant Poiencot also attended the autopsies, at which point projectiles were recovered from the skulls of each body and submitted to the Louisiana State Police Crime Laboratory (LSPCL).

---

[3] On appeal, the defendant notes he was wearing red tennis shoes that night. He claims the subject on the dash cam video and still shots, identified as the defendant by Lieutenant Beck at trial, had on white tennis shoes and, thus, cannot be the defendant. We note the dash cam video and still shots are grainy and low quality, and the colors are distorted by flashing police lights. Nonetheless, based on our review of the dash cam video, still shots, and body cam footage after the gunshots were fired, showing the defendant and his attire, including his shoes, we find a rational juror could have accepted Lieutenant Beck's identification of the defendant.

Detective Robert Mason with the LPSO, the primary investigator in this case, arrived at the scene at approximately 1:00 a.m., at which point the scene was already secured and eighty to one hundred people were present. Detective Mason testified he came in contact with the defendant, who was being loud, boisterous, cursing, and confrontational with one of the officers at the scene. The interaction was captured on body cam footage. Detective Mason testified to the presence of .40 caliber casings near the victims' bodies and further testified he saw a Dodge Dart parked in the area.

Detective Mason confirmed that nine-millimeter casings were found on Meadow Lane the next morning after a resident found them in their driveway. He testified the nine-millimeter caliber casings were approximately three hundred and eighty feet from the location of the bodies, while the .40 caliber casings were located much closer to the bodies. Detective Mason listened to Lieutenant Beck's dash cam footage, which confirmed gunshots were initially fired in the distance, followed by the sound of a louder, apparently closer to the unit, round of gunshots.

Detective Mason testified that after they collected evidence at the scene, the LPSO put out a press release asking for assistance with the case and received emails and calls to Crime Stoppers. One tipster described the shooter as a black male, five feet and nine or ten inches tall, with a short haircut, wearing a khaki Dickie's suit and a white muscle shirt. The tipster reportedly saw the shooting and gave the nickname "Spade" for the shooter. After seeing dash cam footage of vehicles parked near the victims' bodies, the LPSO contacted one of the occupants of the Dodge Dart and was able to identify the tipster as Berryhill, another occupant of the Dodge Dart that night. Berryhill had sent text messages to her friends about the shooter and a Facebook photograph of him. The LPSO contacted Berryhill, she admitted making the Crime Stoppers tip, and she participated in a photographic lineup.

Detective Mason testified Lieutenant Beck's dash cam footage verified parts of Berryhill's statement. Detective Mason further testified regarding the video footage of the defendant's movements just before the second round of gunfire, which he described as a "racking motion." He testified the defendant turned around facing the shed-like metal structure in which the party took place, while the other partygoers continued to walk away from the party location, and then the defendant went out of the camera's view. He testified that after the gunshots were fired, the defendant reappeared in the footage on the side of the police cars, making a motion at his waistband. Based on Berryhill's identification of the defendant as the shooter and the consistent video footage, the LPSO applied for an arrest warrant and a search warrant for the defendant's residence, and executed both warrants on June 17, 2020, three days after the shooting.

After being transported to the Criminal Operations Center, the defendant was advised of his rights and signed a waiver of rights form. During the recorded statement, the defendant ultimately admitted to firing a .40 caliber gun that night, but stated, "I didn't try to kill nobody." At one point, the defendant claimed he fired in the air and further said, "I wasn't trying to shoot them girls, man." The defendant repeatedly stated he was scared for his life. When asked why he did not shoot straight up in the air, the defendant did not respond. The defendant later admitted he "let off maybe what, three or four rounds at the most" and started running again, adding, "[n]o, I think I let out the whole clip."

The defendant's clothes and shoes from the night in question were collected[4] and brought to Sergeant Poiencot, including a khaki Dickie's shirt with "Land Living" on the back in red letters. The left and right front pockets on the shirt also had letters on them stating, "GMB Spade."

---

[4] Detective Mason also testified a firearm was recovered and sent to the lab for testing; however, it was not the gun that was used in the instant shooting. The gun used in the instant shooting was never recovered.

Berryhill testified she arrived at the Raceland party with friends, traveling in an orange Dodge Dart. She testified the theme of the party was Dickie's uniform attire. Once a scuffle started in the party, she headed to the car, assisting her sister-in-law, who had been drinking alcohol. After putting her sister-in-law in the backseat of the car, Berryhill climbed through the driver's door to the passenger side. At one point she looked up and saw a man, whom she identified as the defendant, standing in front of the car in a khaki Dickie's suit with red airbrushing, shooting toward the party. She testified that when the defendant raised his gun, she started the car to try to get his attention, and then sounded the car horn, "trying to stop him." She stated the defendant was six to twelve feet away from her, and estimated he fired eight to ten gunshots while his arm was extended.

Berryhill testified the defendant was initially running from the party with the rest of the crowd, but turned around, extended his arm, and shot in the direction that everyone was running from. She did not see anyone shooting at or chasing the defendant and did not see anyone else shooting. As they were pulling out of the parking spot, Berryhill testified she saw the bodies on the ground in the direction the defendant was shooting.

Berryhill confirmed that she had seen the defendant outside of a white house on St. Louis Street before the night of the shooting, but did not know him personally. After the shooting, she looked for the defendant's Facebook page, took a screenshot of his picture, and sent it to her friends, telling them that he was the shooter. The Monday after the shooting, she anonymously reported her observations to Crime Stoppers, in an initial effort to protect her identity. Berryhill confirmed that once her identity became known to the police, she was contacted by Detective Mason, gave a statement consistent with her trial testimony, and identified the defendant as the shooter in a photographic lineup.

Dr. Michael Defatta, a forensic pathologist and expert witness in that field, conducted the autopsies in this case. Gabriel sustained a gunshot wound lateral to her nose, at the level where the spinal cord enters the brain. The bullet was recovered from her posterior neck and two fragments were recovered from her spinal canal. Dr. Defatta testified the range of fire was "no closer than three to four feet and out" and was at a distance greater than four feet. Francis suffered a gunshot wound to her forehead, from a distance greater than four feet, impacting her left skull where the bullet was recovered.

Chelsee Richardson, a firearms examiner with the LSPCL and expert witness in that field, performed the forensics analysis in this case. Richardson received two .40 caliber cartridge cases and seven nine-millimeter caliber cartridge cases. She also received the firearm submitted by the LPSO for testing. Richardson testified the .40 caliber cartridge casings were not fired from the weapon submitted for testing, but the casings were fired from the same firearm. The projectiles recovered from Gabriel and Francis during the autopsy were also fired from that same, unrecovered, .40 caliber firearm.

The defendant did not testify at trial. The sole defense witness, Dontrell Bryant, was outside near the scene on the night in question. Bryant testified he had a clear view of the shed in which the party took place when people were exiting the party. Two seconds before he heard gunfire, he saw a tall man wearing a hood standing near a trailer with a wheelchair ramp, in the direction of Highway 1, towards Meadow Lane. Bryant stated he knew the defendant and that this individual was not the defendant, noting the defendant was in the opposite direction. Bryant further testified he saw two men in the road toward Buford Street shooting down the street. He added, "[i]t's just people shooting everywhere." After the area cleared up and settled, he saw Gabriel and Francis lying on the ground. Bryant confirmed that he never reported his observations to the police.

On appeal, the defendant contends there is evidence supporting his innocence. He alleges a medical mask found at the scene next to the spent .40 caliber casings was likely worn by the shooter but was not tested for DNA. He also notes his clothes were not tested for gunshot residue. He further notes that other individuals were seen at the scene that night with firearms.

To resolve conflicting testimony relative to factual matters, the jury must make credibility determinations and weigh the evidence. The jury can accept or reject the testimony of any witness. **State v. Eby**, 2017-1456 (La. App. 1st Cir. 4/6/18), 248 So.3d 420, 426, writ denied, 2018-0762 (La. 2/11/19), 263 So.3d 1153. On appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. See **Bessie**, 342 So.3d at 23.

In this case, the police officers all testified that there were two rounds of gunfire that night, coming from opposite directions, fired from two different types of firearms. Based on police testimony and the casings found within the vicinity, the evidence consistently showed the gun fired at and striking Gabriel and Francis was a .40 caliber pistol, while a rifle was fired in the distance. The defendant was observed in the immediate area where the shooting occurred, acting belligerent and agitated. Just before the deadly round of gunshots, the defendant was observed manipulating something in his hand. After the gunshots, the defendant was observed making motions at his waistband, appearing to put something in his pants. The defendant admitted to firing a .40 caliber gun into the crowd. Gabriel and Francis were killed with .40 caliber bullets that were fired from the same firearm as the casings found near their bodies. Moreover, Berryhill, an eyewitness to the shooting, positively identified the defendant before and during the trial, as the person who shot into the crowd, in the direction of Gabriel and Francis.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). In reviewing the evidence presented at trial, we cannot say the jury's determination was irrational under the facts and circumstances presented. See **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 661-62. Viewing the evidence in the light most favorable to the prosecution, we find based on the record before us, a rational trier of fact could have found that the State proved beyond a reasonable doubt all of the elements of both counts of second degree murder and the defendant's identity as the perpetrator. Accordingly, assignment of error of error number three lacks merit.

## SANITY RULING

In assignment of error number one, the defendant argues the trial court committed manifest error in finding him competent to proceed to trial. He notes it is undisputed that he suffered a significant skull fracture when he was either ten or twelve years old. Further, he notes two independent psychiatrists opined he should not stand trial until undergoing further testing.

The Fourteenth Amendment's Due Process Clause protects an individual's right not to proceed to trial while legally incompetent. **State v. Abbott**, 2022-0096 (La. App. 1st Cir. 11/4/22), 356 So.3d 423, 429. In Louisiana, "[m]ental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." La. Code Crim. P. art. 641. The issue of present insanity or mental incapacity to proceed may be raised at any stage of the proceedings, even after conviction. **State v. O'Brien**, 2014-0899 (La. App. 1st Cir. 12/23/14), 168 So.3d 627, 632; see also La. Code Crim. P. art 642.

13

When the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed. La. Code Crim. P. art. 642. If a defendant's mental incapacity has been properly raised, the proceedings can only continue after the court holds a contradictory hearing pursuant to La. Code Crim. P. art. 647 and decides the issue of the defendant's mental capacity to proceed. See **State v. Jackson**, 2016-1565 (La. App. 1st Cir. 10/12/17), 232 So.3d 628, 635, writ denied, 2017-1944 (La. 5/25/18), 243 So.3d 566.

In evaluating the legal capacity of the criminally accused, the Louisiana Supreme Court has stated that the considerations in determining whether a defendant is fully aware of the nature of the proceedings include: (1) whether he understands the nature of the charge and can appreciate its seriousness; (2) whether he understands what defenses are available; (3) whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; (4) whether he has an awareness of his legal rights; and, (5) whether he understands the range of possible verdicts and the consequences of conviction. **State v. Campbell**, 2006-0286 (La. 5/21/08), 983 So.2d 810, 850, cert. denied, 555 U.S. 1040, 129 S.Ct. 607, 172 L.Ed.2d 471 (2008). The Louisiana Supreme Court has also stated that the facts to consider in determining a defendant's ability to assist in his defense include: (1) whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; (2) whether he is able to assist counsel in locating and examining relevant witnesses; (3) whether he is able to maintain a consistent defense; (4) whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; (5) whether he has the ability to make simple decisions in response to well-explained alternatives; (6) whether, if necessary to defense strategy, he is capable of testifying in his own

14

defense; and (7) to what extent, if any, his mental condition is apt to deteriorate under the stress of trial. **Id.**

Louisiana law also imposes a legal presumption that a defendant is sane and competent to proceed. See La. R.S. 15:432; **State v. Carmouche**, 2001-0405 (La. 5/14/02), 872 So.2d 1020, 1041; **O'Brien**, 168 So.3d at 632. Given the presumption of sanity under Louisiana law, the burden lies with the defense to prove by a preponderance of evidence that the defendant lacks the capacity to understand the proceedings against him and that he is unable to assist with his defense in a meaningful way. **State v. Bell**, 2014-0737 (La. App. 1st Cir. 11/7/14), 2014 WL 5801517, *5 (unpublished), writ denied, 2014-2577 (La. 9/18/15), 178 So.3d 145. A reviewing court owes the trial court's determinations as to the defendant's competency great weight, and the trial court's ruling thereon will not be disturbed on appeal absent a clear abuse of discretion. **Carmouche**, 872 So.2d at 1041.

In this case, the defendant filed a motion to determine his capacity to stand trial. The trial court appointed Dr. Sarah DeLand and Dr. Richard Richoux to a sanity commission. In her evaluation, Dr. DeLand noted the defendant received a significant head injury as an adolescent, had a seizure disorder since that time, and had a reported history of special education. She noted he seemed to not be completely cooperative with questions relating to competency and appeared to have symptoms of mental illness and cognitive limitations. She recommended he be found incompetent to proceed.

Dr. Richoux noted the defendant appeared depressed and anxious when he evaluated him. He also noted the defendant's special education history and his head injury in the past and presumed it caused him to develop seizures. Dr. Richoux further stated there was almost certainly some exaggeration of deficits by the defendant and found it was not possible to state his actual impairment without

15

review of any medical records relative to his history of head injury and mental health treatment. Thus, Dr. Richoux found it was not possible to make a determination as to legal sanity until he reviewed the materials needed for competency assessment.

After the submission of the evaluations, the State moved for an independent mental examination of the defendant, as authorized by La. Code Crim. P. art 646. Noting there was no opposition by the defendant, the trial court granted the motion, and Dr. Robert V. Blanche was appointed to evaluate the defendant. At the competency hearing, Dr. Richoux reiterated that he was certain the defendant exaggerated the extent of any impairment he may have had. However, he stated that malingering and legitimate impairment are not mutually exclusive. Dr. DeLand testified the defendant reported hearing voices and paranoia, which she felt should be further evaluated. Dr. Blanche testified that the defendant told him he had a skull injury but did not provide any other details about that history.

Dr. Blanche testified that while more data is always helpful, in this case, medical records regarding the defendant's head injury were not necessary, and he was confident in his assessment based on his clinical examination of the defendant. He testified there was a stark contrast between the defendant's behavior during his examination of the defendant and the defendant's police interview, in that the defendant responded to the officer's questions regarding the offenses in a manner that negated intellectual disability. However, during the evaluation, the defendant seemed to make a deliberate effort to appear confused, though it was not a consistent effort. Dr. Blanche testified the defendant answered some questions correctly and others in a way that suggested malingering. Based on the defendant's responses during the police interview, Dr. Blanche believed the defendant had the ability to assist in his defense. Considering the defendant's memory function and responses as a whole, Dr. Blanche concluded the defendant's

16

attempt to act or appear confused was deliberate. In Dr. Blanche's opinion, the defendant was competent to proceed to trial.

At the conclusion of the hearing, the trial court agreed with Dr. Blanche that the defendant's past head injury and/or treatment or the fact that somebody has previously been diagnosed with an intellectual disability did not automatically result in a finding of incompetency. The trial court considered that Dr. Richoux was certain the defendant had exaggerated the extent of any deficit. Further the trial court noted Dr. DeLand was not fully certain of her determination. Specifically, as the trial court noted, Dr. DeLand was at fifty-one percent in her determination that the defendant should be found incompetent and further evaluated, but further testified she believed the defendant was not completely cooperative and was not forthcoming with his answers. The trial court noted the defendant had the burden of showing a mental deficiency. The trial court concluded that based on the presented evidence, the defendant had not met his burden of proving that he lacked the mental capacity to proceed, further finding the defendant competent.

In finding the defendant competent, the trial court cited **State v. Holmes**, 393 So.2d 670 (La. 1981). On appeal, the defendant argues **Holmes** is inapposite. We disagree. In **Holmes**, both of the doctors appointed to the sanity commission therein said the defendant was uncooperative and thus his examinations were unproductive. The doctors stated more time was needed to ascertain whether the defendant's inability to cooperate was genuine or feigned. The doctors were reluctant to offer an opinion based on fruitless exchanges with the defendant. The trial court questioned the defendant and found that he was capable of standing trial and that his manifest incapacity was deliberately staged. **Id.** at 671-73.

The Louisiana Supreme Court found no error in the trial court's procedure in **Holmes**. The Court held, "It is ultimately the responsibility of the judge to

determine whether a defendant possesses the mental capacity to proceed to trial. The report of the sanity commission is admissible as evidence, but it cannot be used as a substitute for the court's own judgment." (citations omitted). **Holmes**, 393 So.2d at 673. The Court concluded there was no abuse of discretion in the trial court's determination that the defendant did not satisfactorily show that he lacked the capacity to understand the proceedings against him or to assist in his defense. **Id.** at 674.

Similar to **Holmes**, in this case, Dr. DeLand was only at fifty-one percent in her competency determination and Dr. Richoux found he lacked sufficient information to make a determination. Moreover, Dr. DeLand said the defendant was not fully cooperative or forthcoming with answers to questions related to competency, and Dr. Blanche found the defendant made a deliberate effort to act or appear confused. As the Louisiana Supreme Court held in **Holmes**, "[a] defendant cannot prove the incapacity to stand trial merely by having stymied the efforts of the sanity commission." **Holmes**, 393 So.2d at 674.

We note conflicting evidence was presented to the trial court concerning the defendant's capacity to proceed. However, two doctors agreed the defendant exaggerated any deficiency he may have had and made a deliberate effort to misrepresent his condition. While this behavior was noted as not mutually exclusive to mental deficiency, the doctors were not consistently conclusive on the presence of such a defect. While medical evaluations are important, it is ultimately the trial court's responsibility to make the final determination of competency and the court should not simply adopt conclusions of any physicians. See La. Code Crim. P. art. 647; **State v. Howard**, 2018-0317 (La. App. 1st Cir. 9/21/18), 258 So.3d 66, 78, writ denied, 2018-1650 (La. 5/6/19), 269 So.3d 692. The trial court, after weighing that evidence, concluded the defendant was competent to proceed. That determination is entitled to great weight. See **Carmouche**, 872 So.2d at

18

1041. Based upon our review of the record, we find no abuse of discretion in the trial court's ultimate determination that the defendant failed to meet his burden of proof in this case. Thus, we find no merit in assignment of error number one.

## MOTION TO SUPPRESS

In assignment of error number two, the defendant argues the trial court erred in denying his motion to suppress his statement. He argues his unresolved competency issue strongly suggested he was incapable of knowingly and intelligently waiving his rights. He further claims he was subjected to coercive interrogation tactics which resulted in a likely false confession.

Before a confession can be introduced into evidence, it must be affirmatively shown that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La. R.S. 15:451; **State v. Brown**, 481 So.2d 679, 684 (La. App. 1st Cir. 1985), writ denied, 486 So.2d 747 (La. 1986). It must also be established that an accused who makes a confession during custodial interrogation was first advised of his **Miranda** rights. **State v. Adams**, 2015-1155 (La. App. 1st Cir. 12/23/15), 2015 WL 9438859, *8 (unpublished), writ denied, 2016-0172 (La. 2/17/17), 216 So.3d 50. Voluntariness is determined by the totality of the circumstances, with the ultimate focus on whether the statement was the product of an essentially free and unconstrained choice or the result of an overborne will. **State v. Bartie**, 2019-01727 (La. 9/9/20), 340 So.3d 810, 814 (per curiam).

Although the burden of proof is generally on the defendant to prove the grounds recited in a motion to suppress evidence, such is not the case with the motion to suppress a confession. In the latter situation, the burden of proof is with the State to prove the confession's admissibility. See La. Code Crim. P. art. 703(D). In determining whether the ruling on defendant's motion to suppress was correct, this court is not limited to the evidence adduced at the hearing on the

19

motion; we may consider all pertinent evidence given at the trial of the case. **State v. Brumfield**, 96-2667 (La. 10/20/98), 737 So.2d 660, 683, cert. denied, 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362; **State v. Landry**, 2019-0486 (La. App. 1st Cir. 2/21/20), 297 So.3d 8, 18-19.

When a trial court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the trial court's discretion, i.e., unless such ruling is not supported by the evidence. See **State v. Green**, 94-0887 (La. 5/22/95), 655 So.2d 272, 280-81. However, a trial court's legal findings are subject to a de novo standard of review. See **State v. Hunt**, 2009-1589 (La. 12/1/09), 25 So.3d 746, 751; **Landry**, 297 So.3d at 18.

The State may rely on the presumption of sanity provided in La. R.S. 15:432, leaving to the defendant the initial burden of proving the existence of a mental abnormality which, under the circumstances, may have destroyed the voluntary nature of his confession. **State v. Batiste**, 2022-0437 (La. App. 1st Cir. 11/4/22), 2022 WL 16707991, *4 (unpublished). Because a defendant is presumed competent, he has the burden of proving a mental defect such that he was unable to understand his **Miranda** rights and, therefore, incompetent to waive them. **State v. Stephens**, 2011-0995 (La. App. 1st Cir. 2/10/12), 2012 WL 602420, *2 (unpublished), writ denied, 2012-0581 (La. 9/12/12), 98 So.3d 820. In the absence of such a showing the State retains the ultimate burden of proving beyond a reasonable doubt that the confession was voluntary. **Green**, 655 So.2d at 279.

The Louisiana Supreme Court has recognized that a diminished intellectual capacity does not of itself vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. See **State v. Holmes**, 2006-2988 (La. 12/2/08), 5 So.3d 42, 72-73, cert. denied, 558 U.S. 932, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009). The critical factors are whether the defendant was able to understand the rights explained to him and voluntarily gave

the statement. Once the trial judge has determined that the State has met its burden of proof, his decision is entitled to great weight on review. **State v. Hebert**, 2011-1519 (La. App. 1st Cir. 3/23/12), 2012 WL 1012468, *2 (unpublished).

Herein, Detective Mason testified at the hearing on the motion to suppress the defendant's statement. He confirmed he read and went over the defendant's rights before the defendant signed the waiver of rights form. The defendant was informed of his right to remain silent, his right against self-incrimination, and his right to an attorney. He was further informed of his right to stop the interview at any time. The defendant never asked for an attorney or to stop the interview. Detective Mason testified that while the defendant spent an estimated four or five hours in the interview room, as the search warrant was simultaneously being executed, the defendant was not subjected to interrogation during the full period of time.

Detective Mason testified he was familiar with the defendant from seeing him in the community, and was actually the responding officer in the incident that happened when the defendant was a child, resulting in his head injury. While Detective Mason was familiar with the defendant's past, he testified that during every interaction he had with the defendant, other than when he injured his head when he was around nine years of age, he never seemed impaired or "slow."

The interview of the defendant was conducted by Detective Mason and Sergeant Derek Champagne with the LPSO. The recording of the interview lasted approximately one hour and fourteen minutes. As the defendant notes on appeal, the following colloquy took place during the interview:

[DEFENDANT]: So what kinda bullet they got hit with?

CHAMPAGNE: You know.

[DEFENDANT]: Huh.

CHAMPAGNE: You know.

21

[DEFENDANT]: I gotta see this video.

CHAMPAGNE: You will you will. . . . what I'm trying to tell you is you will see the video.

[DEFENDANT]: When, today?

CHAMPAGNE: No, we ain't got, I'm not gonna show you today. It's the difference between a very serious charge or a man who was f*****-up and made an accident. Which I believe you did. It was accidental. Nobody here thinks that you said f*** it, let me just boom-boom-boom . . . F*** no I think, and you know that.

[DEFENDANT]: So, on your children, your wife?

CHAMPAGNE: A thousand, a thousand per-cent.

[DEFENDANT]: That I killed 'em.

CHAMPAGNE: A thousand per-cent. It was the bullets from your gun that you fired, a thousand per-cent, on anything I got, yes sir.

*     *     *     *

[DEFENDANT]: So, they see me walking up to 'em, shooting 'em in the head[?]

CHAMPAGNE: The video of the police cars is one thing that we got, along with video from other people, but that we have our . . . own video, yes. And I [sic] I personally watched it.

*     *     *     *

MASON: Okay, here take a sip of water. I got some napkins for your forehead. Okay. So, look, we ain't bad guys no and we, hey, everybody makes bad decisions. I'm not saying. But look, I wanted to ask you. You weren't intending to shoot any police officers or nothing that night, huh? Cause you know what that is. I wanted to get that out because there was an officer right next to the lady that was killed.

CHAMPAGNE: Both of 'em actually.

[DEFENDANT]: But I don't own a 40-Caliber.[5]

CHAMPAGNE: I didn't say you did.

*     *     *     *

---

[5] The defendant subsequently stated a "young kid" gave him the gun. The defendant stated he did not know the person's real name.

22

[DEFENDANT]: You know what that is? You know what, you know that's [sic] that's the death penalty.

CHAMPAGNE: Well that's what we trying to talk to you about.

MASON: That's what I'm talking to you about. Were you trying to kill the cops? That's the death penalty. Did you make a mistake and discharge a round and two innocent young ladies died? It just so happened one that you know intimately. There's a big difference.

The death penalty was mentioned again when Detective Mason stated, "Is it [f]irst-[d]egree [m]urder cause you wanted to kill cops? . . . Or is it an accidental shooting or you made a bad decision and killed two ladies? There's a big difference between death row and serving some time, big difference." The defendant replied, "I didn't want to hurt nobody." Later, Detective Mason made a similar statement after the defendant stated, "My life gone, man." Detective Mason specifically responded, "Not necessarily, not necessarily. It's serious. You gon' do some time. . . . But it's not death row."

In denying the motion to suppress, the trial court recognized the claims and testimony regarding the defendant's head injury as a child but noted that in viewing the interview, the defendant asked intelligent questions regarding his potential charges and punishment. The trial court further noted the defendant did not seem to be under duress or intimidated and even seemed relaxed. The court noted there were no signs of any fear, threats, or inducement and found the defendant freely and voluntarily confessed.

The defendant now argues the competency issue was not properly resolved at the time of the trial court's ruling on his motion to suppress. The defendant further argues his statement was not freely made, contending the officers used coercive tactics. The defendant contends the officers repeatedly lied about the nature of the evidence against him and made references to the death penalty. The defendant further claims portions of his statement were inconsistent with other evidence presented at trial.

23

In arguing coercive tactics were used to induce a false confession, the defendant relies on the Louisiana Supreme Court's decision in **Bartie**. In **Bartie**, the police were investigating a 1998 unsolved murder. A DNA analysis performed in 2016 showed a sample from the victim's fingernails matched the defendant's DNA. The officers conducted a more than seven-hour interview of the defendant in that case. About thirty-four minutes into the interview, the defendant was told he was facing the death penalty. The detectives offered him a "deal" whereby he would "come clean" and fully confess and avoid being sentenced to death. About forty-eight minutes later, the defendant invoked his right to remain silent and made several more ignored attempts to assert that right during the interview. After two hours passed with no admission, a detective presented a list of death row inmates, photographs of death row, and told the defendant how hot the cells are there. The detective pleaded with the defendant to cooperate and not let the prosecutor send someone else to death row, and presented the defendant with the "deal" in writing, signed by prosecutor. The defendant was described as being emotional and visibly distressed by the threats of death. **Bartie**, 340 So.3d at 810-11, n.1.

As further noted in **Bartie**, the defendant cried, as he ultimately made inculpatory statements. **Id.** at 811. Nearly every revelation was preceded by another threat of losing the "deal" and being sentenced to death. **Id.** at 810-11, n.1. The Supreme Court found the threat of the death penalty and the written offer of a "deal" to avoid it became the dominant theme of the interview.[6] **Id.** at 810. The Court, in part, affirmed the appellate court's determination that statements from

---

[6] Citing **Roper v. Simmons**, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the Louisiana Supreme Court noted the defendant therein could not be sentenced to death for the crime because he was seventeen years old at the time he was alleged to have committed the crime. **Bartie**, 340 So.3d at 811. In that regard, the Court stated, "While a misrepresentation, in and of itself, may not vitiate the voluntariness of an otherwise voluntary confession, see **Frazier v. Cupp**, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (misrepresentations are relevant but do not make an otherwise voluntary confession inadmissible), the repeated threats that defendant would be sentenced to death if he did not confess satisfactorily went beyond a mere misrepresentation." **Bartie**, 340 So.3d at 815.

roughly the forty-eight-minute mark onward were made in violation of **Miranda**, were not free and voluntary, and not admissible for any purpose. **Bartie**, 340 So.3d at 817. The Court also reversed the appellate court's order that the first forty-eight minutes of the police interview could be used only to impeach the defendant if he testified, and reinstated the trial court's ruling that the first forty-eight minutes were admissible to the extent authorized by the rules of evidence. **Id.**

We find the instant case is distinguishable from **Bartie**. We note herein the defendant was the first to bring up the death penalty. Thereafter, the defendant was repeatedly told he would serve some time as opposed to being sentenced to death. Further, unlike the circumstances in **Bartie**, there was no verbal or written promise or "deal" in this case. Moreover, any arguably misleading interrogation techniques used by the officers during the interrogation have been consistently jurisprudentially upheld. See **Holmes**, 5 So.3d at 73-74 (and citations therein).

Based on our review of the recording in its entirety, including portions of the video showing the defendant sitting in the interrogation room alone waiting for the interview to begin and his interaction with the officers during the interview, we find no abuse of discretion by the trial court. The defendant was advised of his rights and signed a **Miranda** rights form waiving those rights. According to the testimony presented at the motion to suppress hearing, the defendant appeared to understand his rights. Before the interrogation began, the defendant was given water and the opportunity to use the bathroom. After initially expressing the desire to lay down and repeatedly asking for a cigarette, the defendant seemed to become more comfortable as the interview went along. He carefully considered whether or not he wanted to make any admissions, seemingly wanting to know what evidence the police already had or did not have. The defendant at one point prudently stated he did not own a .40 caliber firearm, while not denying being in possession of one

on the night in question, and later claiming he borrowed one from someone else at the scene. His ability to understand, respond to questions, and assess the circumstances was consistently apparent. Thus, there was no indication that the voluntariness of the defendant's confession was destroyed by a mental abnormality or defect.

Moreover, there was no indication that the defendant's confession was a result of coercive tactics. Statements by the police to a defendant that he would be better off if he cooperated are not promises or inducements designed to extract a confession. A confession is not rendered inadmissible by the fact law enforcement officers exhort or adjure an accused to tell the truth provided the exhortation is not accompanied by an inducement in the nature of a threat or one which implies a promise of reward. Finally, this court has determined that "trickery" does not by itself render a confession involuntary when considering the totality of the circumstances. **State v. Giles**, 2006-0828 (La. App. 1st Cir. 12/28/06), 2006 WL 3813679, *3 (unpublished), writ denied, 2007-0202 (La. 6/22/07), 959 So.2d 503. In this case, we find the defendant's confession was not the result of an overborne will, but was instead freely, voluntarily, and intelligently given. Assignment of error number two lacks merit.

## PATENT ERROR REVIEW

Pursuant to La. Code Crim. P. art. 920(2), this court routinely conducts a review of all appeals for error discoverable by mere inspection of the pleadings and proceedings and without inspection of the evidence. **State v. Anthony**, 2023-0117 (La. App. 1st Cir. 11/3/23), 378 So.3d 766, 775, writ denied, 2024-00027 (La. 5/21/24), 385 So.3d 242. After a careful review of the record, we have found one patent error.

The record reflects after imposing the sentence, the trial court advised the defendant he has "two years from the date this conviction becomes final to apply

for post conviction relief." However, a defendant generally has two years "after the judgment of conviction *and sentence* has become final" to seek post-conviction relief. La. Code Crim. P. art. 930.8(A) (emphasis added). The prescriptive period does not initially begin to run until the judgment of conviction and sentence have both become final under La. Code Crim. P. art. 914 or La. Code Crim. P. art. 922.

Thus, the trial court failed to adequately advise the defendant of the prescriptive period for seeking post-conviction relief. However, the trial court's failure to properly advise the defendant has no bearing on the sentence and is not grounds to reverse the sentence or remand for resentencing. **State v. Hollins**, 2023-0785 (La. App. 1st Cir. 3/19/24), 387 So.3d 641, 652, writ denied, 2024-00487 (La. 10/1/24), 393 So.3d 865. Out of an abundance of caution and in the interest of judicial economy, we instead advise the defendant La. Code Crim. P. art. 930.8 generally provides that no application for postconviction relief shall be considered if it is filed more than two years after the judgment of conviction and sentence have become final under the provisions of La. Code Crim. P. arts. 914 or 922. **Hollins**, 387 So.3d at 652.

**CONVICTIONS AND SENTENCES AFFIRMED.**